**In re PRIME MOTOR INNS, INC., et al., Debtors.**

**PMI INVESTMENT, INC., Plaintiff,**

**v.**

**Allan V. ROSE, Arthur G. Cohen, and Financial Security Assurance Inc., Defendants.**

**FINANCIAL SECURITY ASSURANCE INC., Counterclaim–Plaintiff,**

**v.**

**PMI INVESTMENT, INC., Counterclaim–Defendant.**

Bankruptcy No. 90–16604–BKC–AJC. Adv. No. 91–1240–BKC–AJC–A.

United States Bankruptcy Court, S.D. Florida, Miami Division.

April 18, 1994.

As Amended May 12, 1994.

Stephen D. Busey, Smith Hulsey & Busey, Jacksonville, FL, and Steven H. Reisberg, Willkie Farr & Gallagher, New York City, for PMI Inv., Inc.

Eric Roth, Wachtell Lipton Rosen & Katz, New York City, and Brian K. Gart, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, FL, for Financial Sec. Assur., Inc.

Marshall J. Cooper, P.A., Fort Lauderdale, FL, for Allan V. Rose and Arthur G. Cohen.

Mark J. Sugarman, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for Allan V. Rose.

George Wade, Shearman & Sterling, New York City, for Committee of Unsecured Creditors.

Robert A. Angueira, Miami, FL, Asst. U.S. Trustee.

## MEMORANDUM DECISION

A. JAY CRISTOL, Chief Judge.

This cause came before this Court for trial on January 18, 19 and 20, 1994. The Court having reviewed the testimonial and documentary evidence, and having had the opportunity to observe the demeanor and candor of the witnesses at the trial, makes the following findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052.

### INTRODUCTION

1. On or about December 27, 1991, PMI Investment, Inc. ("PMI"), one of the debtors herein, filed its original Complaint in this action against Allan V. Rose and Arthur G. Cohen in which it sought to collect under a $50 million personal guaranty signed by Messrs. Rose and Cohen and delivered to PMI in return for PMI advancing a loan to certain companies they controlled. (*See* PMI Exh. 45.)

2. On or about July 20, 1992, Financial Security Assurance Inc. ("FSA") notified PMI that it intended to assert that FSA was entitled to any recovery PMI obtained in this action under the terms of a certain intercreditor agreement, dated November 6, 1989 (the "Intercreditor Agreement") between PMI and FSA. (*See* FSA Exh. 91 [PMI Amended Complaint] at ¶ 38; Tr. [Elwood] at 392–93.)[1]

3. On or about August 25, 1992, in response to FSA's statement, PMI filed an Amended Complaint. The Amended Complaint realleged PMI's claim against Rose and Cohen for recovery under the personal guaranty. The Amended Complaint also added FSA as a defendant in order to obtain a declaratory judgement that any recovery PMI obtained in this action belonged to PMI and to PMI alone. (*See* FSA Exh. 91 at ¶ 40.) On or about October 14, 1992, FSA filed its answer to the Amended Complaint and asserted a counterclaim against PMI for its own declaratory judgment that it was entitled under the Intercreditor Agreement to any proceeds from the litigation.

4. PMI and Rose and Cohen reached a settlement in regard to PMI's claim for recovery under their personal guaranty. Pursuant to a Consolidated and Amended Settlement Agreement, dated as of October 12, 1992, PMI and Rose agreed to a settlement whereby Northeast Hotel Corporation ("NHC"), a corporation wholly owned by Allan Rose, is to purchase the underlying loan, including the personal guaranty, from PMI for a payment valued at the time of trial at approximately $30 to $32 million. (*See* PMI Exh. 1; Tr. [Elwood] at 375–80.)

### FINDINGS OF FACT

(i) *The Events of 1988 and 1989*

5. On February 11, 1988, PMI entered into a loan transaction (the "PMI Loan") with borrowers Northeast Hotel Associates ("Northeast"), Universal Motor Lodges ("Universal") and Southeast Hotel Associates (collectively, the "PMI Borrowers").[2] The PMI Loan is documented by an agreement entitled Amendment and Restatement, dated February 11, 1988 (the "PMI Loan Agreement"). (*See* PMI Exh. 2)

6. The PMI Loan was funded in the initial amount of $60 million and allowed the PMI Borrowers to request additional loan advances up to a total amount of $200 million, subject to the terms and conditions of the Loan Agreement. (Tr. [Bernadino] at 66–67.) At the time of the transaction, Prime Motor Inns, Inc. ("Prime"), the parent company of PMI, owned the Howard Johnson

---

**1.** Citations to the trial transcript are in the following form: Tr. [witness] at "page".

**2.** At the trial, the Court granted FSA's request that it draw an adverse inference against PMI for its failure to call Mr. Kotick and Mr. Sahn as trial witnesses, even though FSA did depose both of the individuals and introduced their deposition testimony into evidence. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 658–59 (11th Cir. 1988). The Court has drawn such inferences in arriving at its findings of fact.

franchise system. The purpose of the PMI Loan was in part to allow the PMI Borrowers to develop new hotels that would be added to the franchise system. (Tr. [Bernadino] at 65–66.)

7. The PMI Loan was secured by the PMI Borrowers delivering to PMI a mix of first and second mortgages on 50 hotel properties owned by them as the collateral for the Loan. (*See* Tr. [Bernadino] at 67; Tr. [Bingham] at 209–10; PMI Exh. 41.) The number of hotels pledged to PMI as security for the Loan soon increased to approximately 60 hotels. (Tr. [Bernadino] at 69; PMI Exh. 7.) The PMI Loan required that the value of these hotels, as calculated according to financial formulas set forth in the Loan Agreement, at all times exceed the outstanding amount of the Loan. (*See* Tr. [Bingham] at 206.)

8. PMI also required that Allan V. Rose and Arthur G. Cohen, two individuals who indirectly owned and controlled the PMI Borrowers, provide PMI with a personal guaranty of the PMI Loan. Rose and Cohen executed a personal guaranty, dated February 11, 1988 (the "Guaranty"), pursuant to which they "jointly and severally, absolutely and unconditionally" guaranteed to PMI all payments due under the PMI Loan up to the amount of $50 million. (PMI Exh. 3; Tr. [Bernadino] at 67–68.)

9. However, the PMI Loan Agreement provided that before PMI could seek any recovery under the Guaranty it first had to exhaust certain remedies against the PMI Borrowers in respect to payment in the form of Management Contracts.[3] (*See* Tr. [Bingham] at 195–96; PMI Exh. 2 at Section 10.1(a).) The Guaranty also provided that PMI had to exhaust its remedies against the collateral before seeking recovery against the

guarantors under certain circumstances. (*See* PMI Exh. 3 at 2.)

10. In late 1988, Mr. Rose decided to seek to refinance some of the first mortgage debt that he had on certain of the hotels that were pledged to PMI under the PMI Loan. As previously noted, the mortgages that were given to PMI were a mix of first and second mortgages. One group of hotels were subject to first mortgages in favor of General Electric Credit Corp. ("GECC"). Mr. Rose wanted to refinance these GECC mortgages because he could obtain lower interest rates. (*See* Tr. [Bernadino] at 71–73, 115; FSA Exh. 21.)

11. By early 1989, Mr. Rose had entered into negotiations with FSA in regard to obtaining a loan, (the "FSA Loan") the proceeds of which would in part be used to repay the GECC mortgages. The Loan from FSA was to be in the amount of $115 million. The borrower under the FSA Loan was to be Southeast Hotel Associates and the Loan was to be secured by approximately 21 hotels. (Tr. [Bernadino] at 71; Tr. [Bingham] at 197–98.)

12. The negotiations with FSA regarding the FSA Loan lasted almost a year. (Tr. [Rose] at 249–50.) On November 6, 1989, the parties were able to complete their transaction and executed a loan agreement entitled Loan and Security Agreement (the "FSA Loan Agreement"), by and between FSA Zeta Co. ("FSA Zeta"), as issuer, and Southeast Hotel Associates, R/C Hotel Associates, Hauppauge Hotel Corporation, Pennco Hotel Corp., PNP General Partner, Inc. and Livonia Realty Inc., as borrowers (collectively, the "FSA Borrowers").[4] (*See* PMI Exh. 36.) While during the initial negotiations of the Loan only Southeast Hotel Associates was contemplated to be the Borrower, as finally structured the number of Borrowers in-

---

3. The Management Contracts consisted of an option whereby the borrowers could repay the loan by entering into contracts requiring them to pay to PMI a fee of six percent of the gross revenues of the hotels. (*See* Tr. [Bingham] at 196; PMI Exh. 2, Section 3.3 at 26.)

4. FSA Zeta obtained the funds to make the FSA Loan from the proceeds of bonds issued by it in the aggregate principal amount of $115 million. FSA provided to FSA Zeta a financial guaranty

insurance policy (the "Policy") which guaranteed the payment of principal and interest on the bonds to the bondholders. In connection with the Policy, FSA obtained assignments entitling it to exercise all rights and remedies with respect to the FSA Loan. (*See* PMI Exh. 43 [FSA Proof of Claim] at ¶ 3.) For purposes of this Opinion, FSA Zeta and FSA will be collectively referred to as FSA, as did the parties at the trial.

creased. This was the result of some internal restructuring as to the owners of the hotels and an attempt to create single purpose bankruptcy remote entities as the Borrowers. (*See* Tr. [Bernadino] at 86; PMI Exh. 27 [Final Executive Summary] at 1.)

13. The FSA Loan to the FSA Borrowers was in the amount of $115 million. (*See* PMI Exh. 36 at 14; Tr. [Utley] at 489–91.) The FSA Borrowers provided to FSA as security for the FSA Loan mortgages and security interests in the 21 hotels owned or leased by the FSA Borrowers. FSA's internal documents show that FSA had these hotels appraised by Hospitality Valuation Service and at the time of the transaction such appraisals showed a value of these hotels of $167.3 million. (*See* PMI Exh. 27 [Final Executive Summary] at 5.) This value is also supported by the testimony of Mr. Rose. (Tr. [Rose] at 253.)

14. FSA also sought and obtained from Rose and Cohen additional collateral. This additional collateral was provided pursuant to an agreement entitled Cohen & Rose Guarantee # 1, dated November 6, 1989 (the "R & C Collateral Guaranty"). (PMI Exh. 37.) The R & C Collateral Guaranty was non-recourse to Rose and Cohen and provided that any payment thereunder was to be paid solely by recourse to two items of specified collateral. Under the agreement, Rose and Cohen pledged to FSA (i) a United States Treasury zero coupon security (the "Zero Coupon Security") in the face amount of $10 million at maturity, and (ii) a letter of credit in the initial amount of $5 million, but which increased annually until maturity. (PMI Exh. 27 at 2; Tr. [Rose] at 251–53.) FSA valued this additional collateral as worth approximately $20 million at maturity. (Tr. [Rose] at 253; *see* PMI Exh. 27 at 2.)

15. Thus, at the time FSA made its $115 million Loan, it had obtained from the FSA Borrowers and Rose and Cohen security which it valued at approximately $187 million.

16. As previously noted, at the time of the initial discussions with FSA, it was contemplated that the borrower under the FSA Loan would be Southeast Hotel Associates and that approximately 21 hotels would serve as collateral for the Loan. Southeast Hotel Associates was at that time also one of the three borrowers under the PMI Loan. Similarly, each of the 21 hotels that were to serve as the collateral for the FSA Loan were among the 60 hotels that were subject to mortgages in favor of PMI. As a result, FSA needed to reach certain agreements with PMI in order for it to make the FSA Loan to Southeast Hotel Associates.

17. A meeting was arranged between representatives of FSA, PMI and the Borrowers in order for FSA to explain what concessions it needed from PMI. This meeting occurred in late March or early April 1989 and was held at PMI's offices in Fairfield, New Jersey. (Tr. [Bernadino] at 72.) The persons attending the meeting included Peter Simon, the Chairman of Prime, which was the parent company of PMI; Joseph Bernadino, Esq., an assistant general counsel at Prime; Eric Sahn, a representative of the Borrowers; Robert King, an attorney at the law firm of Rogers & Wells, counsel to FSA; Peer Pederson of FSA; and Michael Rochford of Merrill Lynch. (*See* Tr. [Bernadino] at 72–73; Tr. [King] at 455.)

18. At that meeting, Eric Sahn explained to PMI that Allan Rose was seeking a loan from FSA to Southeast Hotel Associates for the primary purpose of replacing the GECC first mortgages on approximately 21 of the hotels that served as collateral for the PMI Loan. (Tr. [Bernadino] at 72–74.) The FSA Loan would also provide the Borrower with added cash because it was in an amount somewhat greater than the sum needed to retire the GECC mortgages. (*See* Tr. [Bernadino] at 71–72.) PMI had a second mortgage on each of the 21 hotels that were to secure the FSA Loan.

19. After Mr. Sahn explained the background, Robert King, Esq., an attorney at Rogers & Wells who represented FSA, gave a presentation of the issues and explained what concessions FSA needed from PMI in order for it to make the FSA Loan to Southeast Hotel Associates. (Tr. [King] at 455–56, 474–75.) The essential problem was that FSA was intending to make a loan to a Borrower, namely Southeast Hotel Associ-

ates, that was already a borrower under the PMI Loan, and to take back mortgages on 21 hotels upon which PMI already had existing mortgages. (*See* Tr. [Bernadino] at 72–74; Tr. [King] at 474–75.)

20. Mr. King explained at that meeting that FSA needed PMI to agree to an Intercreditor Agreement which would contain both subordination and standstill provisions in respect of PMI's rights against Southeast Hotel Associates and the 21 hotel properties that were to serve as collateral for the FSA Loan. (Tr. [Bernadino] at 72–75; Deposition of Joseph Bernadino ("Bernadino Dep.") at 168–71.)[5] Mr. King explained that FSA was concerned about PMI's ability to exercise any remedy against the FSA Borrower Southeast Hotel Associates or the hotels that FSA would be receiving as collateral during the time period the FSA Loan was outstanding. The existence of two loans to Southeast Hotel Associates also raised issues of possible insolvency and fraudulent conveyance. (*Id.*)

21. FSA at this meeting explained that in order for it to make the loan to Southeast Hotel Associates it wanted PMI to agree to insulate Southeast Hotel Associates and its assets from PMI during the time period the FSA Loan was outstanding. (Tr. [Bernadino] at 74–75, 115–116.) FSA wanted PMI to agree to a standstill in that PMI would agree not to exercise any rights or remedies it had under the PMI Loan against Southeast Hotel Associates or its assets during the time the FSA Loan was outstanding. FSA also wanted PMI to agree that the PMI Loan to Southeast was to be subordinate to FSA's Loan, including that the mortgages granted to FSA on the 21 hotel properties would be senior to the second mortgages that PMI had on these hotels.[6] (Tr. [Bernadino] 74–75.)

22. Mr. Bernadino and Mr. Simon discussed with Mr. King the ramifications of what he was proposing. (Tr. [Bernadino] at

75.) PMI wanted to make sure that what FSA was requesting would not affect PMI's rights against the other two borrowers under the PMI Loan, namely Northeast and Universal, or the approximately 40 other hotels that served as collateral for the PMI Loan. Mr. King responded that FSA's request was limited to PMI's abilities to proceed against the proposed FSA Borrower and its assets. PMI was free to proceed with whatever other rights and remedies it had under the PMI Loan. (Tr. [Bernadino] at 75–76; Bernadino Dep. at 169–70.)

23. As Mr. Bernadino explained during his testimony at trial, FSA was in substance saying that what it wanted from PMI was an agreement that would in effect "build a wall" around the FSA Borrower and its assets. (Tr. [Bernadino] at 75–76.) During the time period the FSA Loan was outstanding, PMI could not penetrate that wall and FSA's rights to that borrower and those hotel properties would be superior to those of PMI. (Tr. [Bernadino] at 75.)

24. FSA at this meeting did not request any rights against the other PMI borrowers (*i.e.* Northeast and Universal) or in respect of the Guaranty. Neither Northeast or Universal were going to be borrowers under the FSA Loan. Indeed, the Court finds that FSA affirmatively represented to PMI that its request for a subordination and standstill agreement would not affect PMI's rights under the PMI Loan to collect against Northeast and Universal, or their approximately 40 hotels.

25. Mr. King testified at trial that while he recalled the meeting with PMI, his recollection was "vague" (Tr. [King] at 478) and he does not have "any specific recollection of what was discussed at the meeting." (Tr. [King] at 456.) Mr. King admitted, however, that he does remember that Peter Simon discussed the circumstances under which

---

5. Portions of the deposition testimony of Mr. Bernadino, Mr. Kotick and others were offered into evidence by FSA. *See* Tr. at 446; *See also* FSA's Notice of Filing of Transcripts of Depositions, dated January 19, 1994. PMI also introduced into evidence portions of the deposition testimony of Mr. Utley, Mr. Cohen and others. (Tr. at 445–46.)

6. PMI's mortgages were already subordinate to the GECC first mortgages which the FSA Loan was extinguishing. However, because the FSA mortgages would be recorded second in time, FSA needed PMI to acknowledge that PMI's mortgages were to be junior to FSA's mortgages. (Tr. [Bernadino] at 71–72; Tr. [Rose] at 255; PMI Exh. 6 at Section 6.)

PMI would agree to an arrangement with FSA so that FSA could make the Loan to Southeast Hotel Associates. (Tr. [King] at 475–76.) Mr. King also remembers that he discussed with PMI how the proposed Intercreditor Agreement would affect the non-FSA borrowers, such as Northeast. However, Mr. King testified that he did not recall what was said on either of these topics. (Tr. [King] at 475–78.)

26. At the conclusion of the meeting, Mr. King stated that he would send PMI a draft of the proposed Intercreditor Agreement. (*See* Tr. [Bernadino] at 76.) Indeed, the Court notes that Rogers & Wells had already prepared a draft of the proposed Intercreditor Agreement in advance of the meeting with PMI. (*See* FSA Exh. 17 [Rogers & Wells Draft of Intercreditor Agreement, dated Jan. 31, 1989].)

27. Under the cover of a letter dated April 17, 1989, Mr. King forwarded to Peter Simon the promised draft of the proposed Intercreditor Agreement which was prepared by Rogers and Wells. (*See* PMI Exh. 9.) The draft itself bears the legend "R & W Draft 4/18/89" and will be referred to as the "April 18 Draft".

28. Mr. Bernadino was given the April 18 Draft of the proposed Intercreditor Agreement to review. (Tr. [Bernadino] at 78.) Mr. Bernadino reviewed the draft Intercreditor Agreement and determined that the draft was in substance in conformity with what Mr. King had explained FSA needed at their meeting. (Tr. [Bernadino] at 79.)

29. At trial, Mr. Bernadino provided a credible and persuasive explanation of his understanding of the draft Intercreditor Agreement. In particular, Mr. Bernadino explained that the April 18 Draft provided that PMI and FSA were to agree that PMI's rights as to Southeast Hotel Associates and its assets were to be subordinate and frozen, but that PMI's other rights under the PMI Loan were to be unaffected. (Tr. [Bernadino] at 79–81.) Indeed, Mr. Bernadino specifically reviewed the April 18 Draft in order to make sure that the draft did not go beyond what Mr. King had represented was FSA's intent at the meeting and that the draft did not purport to affect PMI's abilities to recover against Northeast, Universal or under the Guaranty. (Tr. [Bernadino] at 80–81.)

30. In particular, Mr. Bernadino noted that the April 18 Draft began with a recital that PMI had an outstanding Loan to Northeast, Universal and Southeast Hotel Associates, but then specifically defined the term "Borrower" for purposes of the Intercreditor Agreement to be only Southeast Hotel Associates. (Tr. [Bernadino] at 80–81.)

31. The April 18 Draft then recited that the "Borrower" (*i.e.* Southeast Hotel Associates) had entered into a Loan Agreement with FSA. (*See* PMI Exh. 9 [April 18 Draft], at Recital B.)

32. The April 18 Draft in Recital D sets forth a clear statement of its purpose as follows:

> D. PMI and the Senior Lenders [FSA] desire to set forth certain of their respective rights against the Borrower and with respect to the property of the Borrower.

(PMI Exh. 9 at Recital D.)

33. The April 18 Draft defined "Subordinated Indebtedness" as meaning "all obligations of the Borrower [*i.e.* Southeast Hotel Associates] under the Prime Agreement." (*See* PMI Exh. 9 at Section 1.3.) Thus, Mr. Bernadino reasonably understood that the obligations owed to PMI by the PMI Borrowers Northeast and Universal were excluded from the definition of Subordinated Indebtedness as that term was being defined for purposes of the Intercreditor Agreement.

34. In light of these defined terms, Mr. Bernadino reviewed the remaining provisions of the April 18 Draft. In particular, the Court notes that Section 2.2 provides that the parties agreed that the scope of the subordination is limited "to the extent and in the manner provided herein." (PMI Exh. 9 at 2.2). The provision also speaks in terms of the Subordinated Indebtedness being subordinated "as a claim against the Borrower or any assets of the Borrower . . . ." Similarly, the draft provides that "the Borrower will not make and the Subordinated Lender will not accept" payments on account of the Subordinated Indebtedness "whether such pay-

ments are made or attributable to Borrower or any successor in interest. . . ." Finally, the payments listed as within the scope of the subordination are all payments that are made either by the Borrower or are out of its assets.

35. Mr. Bernadino concluded, based upon his review, that the April 18 Draft substantially conformed to the parties mutual intent that its scope was to be limited to effecting PMI rights only as to Southeast Hotel Associates and its 21 hotel properties. (Tr. [Bernadino] at 81, 83.) PMI's independent rights to receive payment from non-FSA borrowers Northeast, Universal or under the Guaranty were not to be affected. As he testified, the effect was to do "exactly what [Mr. King] told me he was going to do, carve out Southeast, make them a non-entity as far as our ability to recover on our Loan." (Tr. [Bernadino] at 81.)

36. Mr. Bernadino did make some minor comments on the draft. In particular, in several places he requested that FSA insert the phrase "with respect to the Subordinated Indebtedness". (Tr. [Bernadino] at 82; PMI Exh. 11.) He requested this change because PMI had a business relationship with Southeast Hotel Associates as a vendor providing it with such items as furniture and supplies that Southeast needed to operate its hotels. Mr. Bernadino wanted to make it clear that the Intercreditor Agreement did not restrict PMI from pursuing its rights against Southeast Hotel Associates that arose from that separate relationship. These changes were accepted by FSA. (Tr. [Bernadino] at 82.)

37. Mr. Bernadino explained that he did not make any comments specifically requesting that payments by Northeast, Universal or Rose and Cohen under the Guaranty be "carved out" of the proposed Intercreditor Agreement because he did not believe that the draft purported to include them. (Tr. [Bernadino] at 80–83, 133.) Mr. Bernadino explained that when he reviewed the April 18 Draft he specifically noted that the draft did not purport to include any restrictions as to Northeast, Universal or the Guaranty. (Tr. [Bernadino] at 80–81.) Because none of these entities were identified as being affected by the provisions of the Intercreditor

Agreement, there was no need to expressly include them. (Tr. [Bernadino] at 83.) The Court also finds that such a conclusion was also consistent with the expectations Mr. Bernadino had as to the intended scope of the proposed Intercreditor Agreement as the result of the statements made by FSA's attorneys at his prior meeting with FSA. (See Tr. [Bernadino] at 75–76, 79–80.)

38. Mr. King testified that he supervised the drafting of the Intercreditor Agreement and that he believes that its language is broad enough to include within its scope a restriction on PMI's right to receive payments on the PMI Loan from the non-FSA borrowers Northeast and Universal as well as under the Guaranty. (Tr. [King] at 460–62.)

39. Mr. King acknowledged, however, that at the time of the negotiations, he was familiar with the PMI Loan, knew that FSA was not going to be making a loan to Northeast or Universal, and knew the Rose and Cohen had given PMI a $50 million personal Guaranty. (Tr. [King] at 457–58, 470–71.) Mr. King tried to explain the April 18 Draft's failure to mention any restriction on PMI receiving payments from the non-FSA borrowers Northeast and Universal or from the Guaranty as simply not "necessary" because it is not typical "to mention all the possible sources of payment." (Tr. [King] at 463–64.)

40. The Court finds that the April 18 Draft of the Intercreditor Agreement did not include any express restriction on PMI's right to receive payment from Northeast, Universal or Rose and Cohen under the Guaranty because it was not FSA's intent to restrict in any way PMI's right to receive payments from such sources. Instead, it was FSA's intent only to restrict PMI's right to receive payment from the FSA borrower Southeast Hotel Associates or out of its assets.

41. Mr. King's conclusion that the draft Intercreditor Agreement intended a broader scope is contradicted by the testimony of Mr. Bernadino, which the Court finds credible and persuasive, as to the statements made at the meeting between the parties in late

March or early April 1989. (*See* Tr. [Bernadino] at 73–81; Bernadino Dep. at 167–71.)

42. Mr. King's conclusory testimony at trial is also not persuasive in light of his candid admission at trial that he does not recall *ever* discussing whether or not the $50 million Rose and Cohen Guaranty was to be subject to the scope of the Intercreditor Agreement with *anyone* at Prime, with *anyone* affiliated with the Borrowers or their attorneys, with *anyone* at his law firm of Rogers & Wells, or with *anyone* at his client FSA. (Tr. [King] at 471–73.) Mr. Utley, the partner at Rogers & Wells in charge of the FSA Loan transaction, similarly testified to the same effect. (Tr. [Utley] at 585–90). Indeed, Mr. Utley testified that the first time he considered this issue was after the litigation commenced. (Tr. [Utley] at 591–92).

43. Mr. King acknowledged that at the time of his meeting with PMI and the preparation of the April 18 Draft he knew that the proposed FSA Loan was to be in the amount of $115 and he was familiar with the PMI Loan and that Rose and Cohen had given PMI the $50 million Guaranty. (Tr. [King] at 457–458; 470–71.) If FSA had intended to request PMI to subordinate its rights to a $50 million personal Guaranty, there is no reasonable explanation as to why it failed to mention that in the face-to-face meeting with PMI in late March or early April and again failed to make any direct reference to the Guaranty in its April 18 Draft of the Intercreditor Agreement.

44. Indeed, the second sentence of Section 2.2 of the April 18 Draft, which is a key sentence setting forth the scope of the subordination, includes on its face a list of payments which are specifically identified as to be included within the scope of the subordination, including (i) "distributions on a claim against a Borrower"; (ii) payment in a Reorganization intended to protect the interest of the Subordinated Lender"; and (iii) any distribution to the Subordinated Lender in a Reorganization". (PMI Exh. 9 at § 2.2.) The very document which Rogers & Wells prepared thus specifically identifies and lists payments that are covered. Had FSA intended to include payments from Northeast, Universal or by Rose and Cohen under the

Guaranty within the scope of the Intercreditor Agreement it would have been a simple matter to include them.

45. Mr. King further acknowledged that each of these types of payments specifically listed in the Intercreditor Agreement are ones which may be characterized as payments "in connection with", "on account of", or "as protection for" the Subordinated Indebtedness even though as a technical matter they may not be made by the FSA Borrower. (Tr. [King] at 480–82.) The Court notes that all of the payments which Rogers & Wells chose to list as examples of the payments that are to be covered by the Intercreditor Agreement are payments which are either by an FSA Borrower or out of the assets of a Borrower or its estate.

46. PMI was generally in favor of cooperating to the extent that it could in order to allow the FSA Loan to go forward. (Tr. [Bernadino] at 76.) The closing of the FSA Loan had certain advantages to PMI because it would have the effect of retiring the GECC mortgages. This was advantageous to PMI because PMI had a contingent obligation to purchase the mortgages on the Southeast Hotel Associates owned properties, subject to certain conditions, upon the maturity of the GECC loan. (Tr. [Bernadino] at 76, 114.)

47. PMI's senior management met to consider their response to FSA's request for an Intercreditor Agreement. (Tr. [Bingham] at 200.) The problem posed by the request for the Intercreditor Agreement was obvious: Prime would lose the right to pursue Southeast Hotel Associates, which was one of the three borrowers under the PMI Loan, or to foreclose against 21 of the 60 hotels that formed the collateral for its Loan, until and unless FSA was first repaid. In addition, because the FSA Loan was in an amount greater than the GECC mortgages, the value of PMI's second mortgages on the hotels was reduced. (Tr. [Bingham] at 197–201.) The people involved in making this decision included Peter Simon, Prime's chairman; Robert Bingham, who was Prime's Treasurer and the senior business person responsible for the PMI Loan, and Joseph Bernadino. (Tr. [Bingham] at 200).

48. Robert Bingham recommended that PMI agree to the requested Intercreditor Agreement provided PMI was able to receive two things in return.[7] First, the PMI Loan provided that the PMI Borrowers had the right to request very substantial advances of principal, up to a cap of approximately $200 million, over and above the amount of quarterly interest that was due. Mr. Bingham recommended that PMI demand that the PMI Loan be amended so as to restrict the size of the new advances that could be requested under the PMI Loan to the amount of interest due. The effect would be to make the PMI Loan a cash flow neutral loan, with full principal and accrued interest due on maturity. (Tr. [Bingham] at 200–01; Tr. [Bernadino] at 84).

49. Second, Mr. Bingham recommended that PMI should request that Rose and Cohen amend their $50 million personal Guaranty so that PMI would have the clear, absolute and immediate right to pursue the guarantors, without having to resort to any prior remedies of any kind, in the event of a default under the PMI Loan. (Tr. [Bingham] at 201.) PMI was thus to have immediate access under this amendment to the Guaranty (the "Amended Guaranty") to recover up to $50 million from Rose and Cohen in the event of any default under the PMI Loan during the time period when PMI's rights against Southeast Hotel Associates and its 21 hotels were restricted by the Intercreditor Agreement. (Tr. [Bingham] at 201–02.) Payments that PMI were to receive under the Amended Guaranty were not to be subject to the Intercreditor Agreement and would belong to PMI alone. (Tr. [Bingham] at 203–04; Tr. [Bernadino] at 84–85.) It was also Mr. Bingham's position that if Rose and Cohen refused to provide the Amended Guaranty, that PMI should refuse to sign the Intercreditor Agreement. (Tr.

[Bingham] at 203.) Mr. Bingham's recommendations were accepted.

50. Allan Rose was the person ultimately responsible for making the decisions both as to the proposed FSA Loan and as to the requests being made by PMI.[8] Mr. Rose is a very interesting self-made man who started as a construction laborer and has built a substantial real estate business. (Tr. [Rose] at 247.) The Court also notes that his testimony was both credible and candid, and that he has retained a very positive attitude in the face of substantial business related adversity.

51. Mr. Rose was personally involved in dozens of meetings and telephone calls with FSA regarding the proposed FSA Loan. (Tr. [Rose] at 249–50.) Mr. Rose understood that FSA required as a condition for the FSA Loan that PMI enter into an Intercreditor Agreement. (Tr. [Rose] at 255.) It was his understanding that FSA wanted the Intercreditor Agreement so that (i) FSA would be in a senior position as to any FSA Borrower and their hotel properties and (ii) PMI could not pursue any rights or remedies against any FSA Borrower or its assets during the time period the FSA Loan was outstanding. (Tr. [Rose] at 255.)

52. Moreover, a main topic of many of the meetings that Mr. Rose had with FSA was on the subject of what collateral was to be given to FSA in connection with the FSA Loan. (Tr. [Rose] at 251.) These discussions included both what hotels were to be collateral for the FSA Loan and what types of guaranty Mr. Rose would separately provide. (Tr. [Rose] at 251–53.)

53. At no time during any of these discussions with Mr. Rose did FSA ever request any rights as to the hotel properties owned by Northeast and Universal or any rights as to the $50 million Guaranty which Mr. Rose and Mr. Cohen had previously given to PMI. (Tr. [Rose] at 254.) Nor did FSA ever say

---

7. FSA also requested that PMI agree to make a related change to the PMI Loan Agreement by adding a provision which limited PMI's right to recover from any of the FSA Borrowers to the "net worth" of such FSA Borrower. (Tr. [Bingham] at 214–15; See PMI Exh. 4 at 6 [new Section 2.1].) Notably, FSA only requested this restriction apply to the FSA Borrowers; it does not apply to Northeast or Universal.

8. Arthur Cohen testified at his deposition that he relied upon Mr. Rose to manage this investment, and that while Mr. Rose kept him informed, he deferred to Mr. Rose's judgment in regard to this matter. (*See* Cohen Dep. at 73.)

anything to Mr. Rose during any of these discussion that indicated they believed that they had any such rights. (*Id.*)

54. Mr. Rose also had a number of discussions with PMI as to FSA's request that PMI agree to the proposed Intercreditor Agreement. (Tr. [Rose] at 256.) The purpose of these discussions was to convince PMI to agree to sign the Intercreditor Agreement. These discussions were primarily with Peter Simon and Joseph Bernadino, may on occasion also have included Robert Bingham, and occurred over a several month period of time. (Tr. [Rose] at 256–57.)

55. As a result of these discussions, Rose eventually agreed to both of PMI's conditions in order to obtain its consent to the Intercreditor Agreement: (i) an amendment to the PMI Loan restricting the size of new advances and (ii) providing PMI with an Amended Guaranty. (Tr. [Bingham] at 202; Tr. [Rose] at 257–62.) Mr. Rose testified that he understood that PMI "would not agree to enter into the Intercreditor Agreement unless" he executed the Amended Guaranty. (Tr. [Rose] at 289.) In his words, the Amended Guaranty "was the *quid pro quo*" for PMI agreeing to sign the Intercreditor Agreement. (Tr. [Rose] at 289; 343–45.)

56. The purpose of amending the Guaranty was so that PMI could pursue its rights against Rose and Cohen during the time period that its rights were restricted as to the FSA Borrowers by the Intercreditor Agreement with FSA. (Tr. [Rose] at 257–62, 344; Tr. [Bernadino] at 84–85; Tr. [Bingham] at 201–204; PMI Exh. 29.) It was the parties' intention that by amending the Guaranty PMI would be relieved of any obligation to exhaust any remedy of any kind before pursing Rose and Cohen under the Amended Guaranty. The parties also intended that any money PMI collected under the Amended Guaranty would be retained by PMI. (*Id.*)

57. The Court further finds that FSA was aware that PMI was requesting that Rose and Cohen amend their personal Guaranty from a deficiency guaranty to a primary payment guaranty in return for PMI's agreement to sign the Intercreditor Agreement.

(Tr. [Utley] at 365–67.) Mr. Rose recalls that this subject came up at meetings and that FSA was informed that Rose had amended his personal Guaranty in order to get PMI to sign the Intercreditor Agreement. (Tr. [Rose] at 285.) This is confirmed by the testimony of Frederick B. Utley, III, the senior partner at Rogers & Wells responsible for the representation of FSA in this matter. (Tr. [Utley] at 365–70; 557–58; Utley Dep. at 104–108.)

58. Mr. Utley testified that he knew that PMI had required that Rose and Cohen amend their personal Guaranty from a deficiency guaranty to a primary payment guaranty in return for PMI's agreement to sign the Intercreditor Agreement. (Tr. [Utley] at 365–66; 557–58.) Mr. Utley recalls that during his conversations with Charles Kotick, Esq., the attorney for Rose and Cohen and their related companies, Mr. Kotick explained to him that FSA's request for an Intercreditor Agreement from Prime was putting Mr. Kotick's clients in a "difficult position" because the "Rose/Cohen entities were having to go ask Prime for something and as businessmen [Prime was] going to get something for it"; that his clients "were going to have to give up assets or claims or rights" in order to get PMI's agreement to sign the Intercreditor Agreement. (Tr. [Utley] at 525–26.) Mr. Utley specifically recalls that he was informed in these negotiations that "Prime was asking for more rights from Mr. Rose and Mr. Cohen and that involved negotiations about reformatting the guarantee." (Tr. [Utley] at 551.)

59. Mr. Utley also recalls that the negotiations between PMI and Mr. Rose and Mr. Cohen on amending the Guaranty "appeared to be protracted" and that the results of those negotiations "might or might not convince Prime to" sign the Intercreditor Agreement. (Tr. [Utley] at 368.) Mr. Utley admits that he discussed this topic both with colleagues at Rogers & Wells as well as with Mr. Pedersen and Mr. Cook at FSA. (Tr. [Utley] at 367–68.)

60. The Court finds that FSA knew that PMI was demanding that Mr. Rose and Mr. Cohen amend their personal Guaranty in re-

turn for PMI's agreement to sign the Intercreditor Agreement; knew the principal terms of that amendment; knew that PMI might not sign the Intercreditor Agreement in the absence of such an Amended Guaranty; and periodically discussed the status of these negotiations with Mr. Rose or his counsel.

61. The testimony is also uncontradicted that FSA never voiced any objection during these negotiations and, indeed, never requested even to see a copy of the Amended Guaranty. Mr. Utley was asked directly:

Q: Did FSA take any position one way or the other in these negotiations between Rose and Cohen and Prime as to the requested amendment to the Rose and Cohen guaranty?

He answered as follows:

A: Let me say that we were simultaneously negotiating the guarantee and side letter that were previously put into the record. I cannot recall whether we did or did not draw analogies and make arguments based on the shape and scope of the proposed amended guarantee from Rose and Cohen to PMI.

(Tr. [Utley] at 370.)

62. Similarly, Mr. Utley was asked why the fact that Rose and Cohen were amending their Guaranty was not important to FSA. He candidly answered that it wasn't important,

[b]ecause we had the transaction. We thought we had our transaction [which] was with a set of borrowers, their transaction [was] with a set of borrowers. We didn't have any negative covenant on Mr. Rose and Mr. Cohen as to what they might do then or in the future with anybody.

(Tr. [Utley] at 558.) The Court notes that Mr. Utley's view of the two transactions as separate and independent as expressed in this answer and elsewhere in his testimony is in many respects similar to that testified to by Mr. Bernadino. (*See* Tr. [Bernadino] at 75–76.)

63. Indeed, Mr. Utley testified that although Section 2.1 of the Intercreditor Agreement contained a clause prohibiting PMI from making "any amendment or modification of the Prime Agreement, the Management Contracts or any Extension Loans" (*see* PMI Exh. 6 at § 2.1), that provision of the Intercreditor Agreement does not cover the Rose and Cohen $50 million personal Guaranty. (Tr. [Utley] at 630–31.) In fact, according to Mr. Utley, PMI and Rose and Cohen could have just agreed "to tear it up" without any objection from FSA. (Tr. [Utley] at 631.)

64. On October 16, 1989, Joseph Bernadino forwarded a draft of the proposed Amended Guaranty to Mr. Kotick and to Mr. Sahn. (See PMI Exh'ts 24 & 25.) This draft of the Amended Guaranty, with some minor changes, was accepted by Mr. Rose and Mr. Cohen. The Amended Guaranty was the *quid pro quo* for PMI's consent to signing the Intercreditor Agreement and this is plain from the face of the Amended Guaranty itself. The Amended Guaranty provides, in part, as follows:

We now request that you accommodate certain of our affiliates by entering into an Intercreditor Agreement dated as of November 3, 1989 and related agreements with FSA Zeta Co., Financial Security Assurance Inc. and First National Bank, as Trustee with respect to a certain loan made to our affiliates by them.

You have agreed to our request but have required that our guarantee be modified as set forth in this letter.

In consideration for your accommodation to our affiliates and for your execution of the Intercreditor Agreement we agree that our obligation is primary and not for deficiencies and that you may seek recourse against us without first seeking recourse against any collateral or the Borrowers. Specifically, you shall not be required to undertake and carry out any proceedings, judicial or otherwise, as are required to foreclose upon and liquidate the collateral before seeking payment from us.

(*See* PMI Exh. 5.) Significantly, this direct and unconditional right of recourse against Rose and Cohen granted by the Amended Guaranty by its own terms expired 120 days after expiration of the Intercreditor Agreement. Thereafter, the prior Guaranty, with-

out the amendment, would continue to control.

65. During October and early November 1989, all the parties also made final comments to the drafts of the Intercreditor Agreement, and the amendment to the PMI Loan. (*See* PMI Exh'ts 26–29 and 30.) As previously noted, FSA had requested a certain amendment to the PMI Loan to add a "net equity," limitation on the amounts owed by the FSA Borrowers to PMI. (*See* footnote 7, *supra.*) Similarly, PMI had insisted on certain changes to the PMI Loan as a condition for signing the Intercreditor Agreement. (*See* Tr. [Bingham] at 200–01.) All of these changes were reflected in an amendment to the PMI Loan that was later executed simultaneously with the FSA Loan. (*See* PMI Exh. 4.)

66. On October 20, 1989, FSA forwarded to Standard & Poor's Corporation (Standard & Poor's) and Moody's Investor Services, Inc. (Moody's), two securities rating agencies, copies of a Final Executive Summary regarding the proposed FSA Loan. (*See* PMI Exh. 27.) These two rating agencies were important to the ability of FSA to complete the transaction because it was a condition of the FSA Loan closing that FSA receive a AAA rating on the bonds that were being issued to raise the funds. (Tr. [Utley] 494–97.) These rating agencies analyze the economic, legal and structural integrity of a transaction in order to assign a rating to the debt that is being issued and insured. (Tr. [Utley] at 495.)

67. The Final Executive Summary is a description of the proposed FSA Loan transaction that was prepared internally at FSA. (Tr. [Utley] at 598–99.) It is a document used in connection with a transaction being submitted to FSA senior management for approval. (Tr. [Utley] at 599.) As is clear from the document itself, the Final Executive Summary provides a detailed summary of the transaction, including an extensive discussion of the financial underwriting considerations, with a special emphasis on the evaluation of potential risk in the event of default. (*See* PMI Exh. 27.)

68. As a contemporaneous document prepared by FSA itself, its description of the transaction and the Intercreditor Agreement is especially probative of FSA's intent. The Final Executive Summary acknowledges that PMI has an existing loan with "certain of the [FSA] Borrowers *and other* affiliated entities as borrowers." (emphasis added) (PMI Exh. 27 at 3.) The Final Executive Summary then describes the Intercreditor Agreement as one where PMI has subordinated its rights "against the [FSA] Borrowers and the [21] Properties." (PMI Exh. 27 at 4.) There is no mention in the Final Executive Summary of the Intercreditor Agreement providing FSA with any rights as to Northeast or Universal, *i.e.* the "other affiliated entities", their 40 hotels, or the Rose and Cohen Guaranty.

69. Similarly, the Final Executive Summary contains a list of the properties that are collateral for the FSA Loan and of the additional collateral that was being separately provided by Rose and Cohen. (PMI Exh. 27 at 2, 5 and attachment 1–A.) Again, there is no reference of any kind to either Northeast and Universal, the 40 hotels owned by them, or to the Rose and Cohen $50 million personal Guaranty. The Court finds that if FSA had any belief at the time that it had any rights under the Intercreditor Agreement to any of these substantial additional assets or sources of repayment, then some mention would have been made of such rights in this document.

70. On November 3, 1989, FSA issued a Private Placement Memorandum whereby it offered $115 million in bonds for sale in connection with the FSA Loan. (*See* PMI Exh. 33.) Rogers & Wells assisted in the preparation of the Private Placement Memorandum. (Tr. [Utley] at 602.) The Private Placement Memorandum contains an extensive description of the transaction, including a detailed discussion of the sources of repayment of the Loan. (*See* PMI Exh. 33 at 9–11, 26–27, 48–54.)

71. In the Private Placement Memorandum, the PMI Loan is described as a loan between PMI and *"certain* Mortgagors [the FSA Borrowers] *and other* affiliated entities [*i.e.* Northeast and Universal] as borrowers." (PMI Exh. 33 at 54.) The description clearly acknowledges that the PMI Loan is out-

standing to several entities, only some of whom are also FSA Borrowers. The Intercreditor Agreement is then described as one in which PMI has agreed "to subordinate its rights to receive payment from *those* Mortgagors and their respective Mortgaged Properties [the 21 hotels]. (emphasis added) (PMI Exh. 33 at 56.) Again, while there is an extensive discussion of all the sources of payment under the FSA Loan, there is no mention of any rights of any kind to payments by the non-FSA Borrowers Northeast, Universal, or Rose and Cohen pursuant to their $50 million personal Guaranty.

72. The FSA Loan closed on November 6, 1989. (Tr. [Bernadino] at 85–86.) The closing was held at the offices of Rogers & Wells in New York. At the closing, Mr. Bernadino was given a copy of the Amended Guaranty which was signed only by Mr. Rose, because Mr. Cohen was not available at that time to sign it. (Tr. [Bernadino] at 87; Tr. [Rose] at 261; *see* PMI Exh. 32.) He was told that Mr. Cohen would sign the Amended Guaranty later and a fully executed copy would be forwarded to him. After checking with his superiors at the company, Mr. Bernadino was told that Mr. Rose's signature alone was sufficient for purposes of the closing. (Tr. [Bernadino] at 87.) Mr. Bernadino then executed the Intercreditor Agreement, the amendment to the PMI Loan and other required documents. (Tr. [Bernadino] at 87.)

73. The Court finds on the basis of all the evidence at trial, a portion of which has been summarized above, that FSA did not intend that the Intercreditor Agreement affect in any way PMI's rights against (i) Northeast and Universal, including their 40 hotels or (ii) Rose and Cohen pursuant either to the original or the amended $50 million personal Guaranty.

74. The Court further finds that FSA knew that PMI was requesting the Amended Guaranty as consideration for signing the Intercreditor Agreement and that PMI might not have signed the Intercreditor Agreement in the absence of receiving the Amended Guaranty. On the basis of all the evidence, the Court further finds that FSA also knew, or reasonably should have known,

that PMI's interpretation of the Intercreditor Agreement was that (i) payments by the Northeast or Universal were not subject to the scope of the Intercreditor Agreement and (ii) that payments by Rose and Cohen pursuant to the Guaranty or the Amended Guaranty were outside the scope of the Intercreditor Agreement.

ii. *The Prime Bankruptcy Proceedings and the Defaults Under the PMI Loan and the FSA Loan.*

75. On September 18, 1990, Prime, PMI and certain of their affiliated entities (collectively, the "Prime Debtors") each filed a voluntary petition with this Court for reorganization under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

76. On May 14, 1991, FSA filed its Proof of Claim against PMI. (*See* PMI Exh. 43.) In describing its claim, FSA recited that on November 6, 1989, it had entered into the FSA Loan pursuant to which it had "made mortgage loans to certain mortgagors" and "[a]s security for the mortgage loans, the mortgagors granted first priority security interest in certain hotel properties." (PMI Exh. 43 at ¶ 3.) The Proof of Claim then states that "[i]n connection with the aforementioned transaction, the Debtor, FSA and other parties entered into the annexed Intercreditor Agreement wherein the Debtor [PMI] acknowledged and agreed that its right under the PMI [Loan] Agreement to receive payment *from those mortgagors* and *their* respective mortgaged hotel properties is subordinate to the prior payment in full of all of such mortgagors obligations" under the FSA Loan. (PMI Exh. 43 at ¶ 4.) (emphasis added).

77. In the summer of 1991, the PMI Borrowers commenced an adversary proceeding against PMI entitled *Northeast Hotel Associates, et al. v. Prime Motor Inc., et al.,* Adversary Proceeding No. 91–0630–BKC–AJC–A (Bankr.S.D.Fl.) In that action, the PMI Borrowers asserted that they were unable to provide PMI with audited financial statements as required under section 6.5 of the PMI Loan Agreement because the PMI Borrowers accountants, Laventhol & Horwath,

who typically had prepared such financial statements, had in November 1990 filed for relief under the Bankruptcy Code. (*See* FSA Exh. 113.) The PMI Borrowers sought a permanent injunction prohibiting PMI from declaring an event of default under the PMI Loan for a period of 120 days so that the new accountants would have the time needed to prepare the required audited financial statements. (*See* FSA Exh. 114.) This Court granted a preliminary injunction by Order, dated August 23, 1991. (*See* FSA Exh. 115.) By subsequent Order, dated December 30, 1991, the *Northeast* adversary proceeding was dismissed and the preliminary injunction vacated. (*See* PMI Exh. 46.)

78. By notices to the FSA Borrowers dated September 16, 1991, October 2, 1991, November 1, 1991 and November 6, 1991, FSA notified the FSA Borrowers of events of default under the FSA Loans. (*See* PMI Exh. 1 at ¶ H.) Pursuant to such notices, FSA accelerated the principal balances due under the FSA Loan. (*Id.;* FSA Exh. 50 at 2–3.)

79. On December 16, 1991, PMI gave notice to Rose and Cohen of numerous events of default under the PMI Loan and demanded payment pursuant to the Amended Guaranty. (*See* FSA Exh. 80 [Letter from Simon to Rose].) On December 30, 1991, PMI filed its original Complaint in this adversary proceeding against Rose and Cohen to recover $50 million under the Amended Guaranty. (PMI Exh. 45.)

80. In early December 1991, John Elwood, who was at that time the Director of Reorganization for all the Prime Debtors (Tr. [Elwood] at 373–74), met with attorneys for FSA. (Tr. [Elwood] at 382–83.) At that time, FSA was represented by the law firm of O'Melveny & Meyers. (Tr. [Elwood] at 382.) At the December meeting, Mr. Elwood explained that PMI was going to pursue Mr. Rose and Mr. Cohen under the Amended Guaranty. Mr. Elwood learned at that meeting that FSA was in negotiations with the FSA Borrowers aimed at trying to structure a consensual Chapter 11 proceeding pursuant to which FSA would obtain possession of all the collateral pledged to FSA under the FSA Loan. (Tr. [Elwood] at 383–84.)

81. Mr. Elwood sought the meeting with FSA's attorneys because he had learned during the course of the prior adversary proceeding concerning the failure of the PMI Borrowers to deliver their required audited financial statements, that the attorneys for Rose and the PMI Borrowers were taking the position that PMI could not pursue any of the PMI Borrowers or Rose and Cohen under the Amended Guaranty because of the standstill provisions contained in the Intercreditor Agreement and had indicated that they were lobbying FSA to try to get support for that position. (Tr. [Elwood] 384–85.) Mr. Elwood did not agree that the Intercreditor Agreement restricted PMI's right to pursue payment under the Amended Guaranty and wanted to obtain some assurance that FSA agreed with PMI. (Tr. [Elwood] at 383.)

82. While Mr. Elwood testified that he thought that PMI and FSA reached an informal understanding, the Court finds that there was no binding agreement made at this December 1991 meeting between PMI and FSA. As of that time, however, FSA was certainly on notice of PMI's interpretation of the Intercreditor Agreement and its intention to pursue collection under the Amended Guaranty. (*See* Tr. [Elwood] at 383–86; Tr. [Dorian] at 639–40.)

83. Rose's attorneys continued to lobby FSA to intervene in the action PMI had commenced against Rose and Cohen to collect under the Amended Guaranty. (Tr. [Dorian] at 646–47.) Mr. Rose candidly stated at trial that at that time he and his attorneys were desperately trying to slow down the "avalanche" of this action against him. (Tr. [Rose] at 266–67.) Mr. Rose's attorneys had advised him that because in some ambiguity in some of the language in the Intercreditor Agreement that they could argue that PMI could not enforce any claim against him until the expiration of the standstill period contained in the Intercreditor Agreement. (Tr. [Rose] at 266–69.)

84. It was not Mr. Rose's position that FSA had any right to seek to pursue him to recover under the Amended Guaranty. (Tr. [Rose] at 268–69.) Indeed, such a position

could simply have invited FSA to join with PMI as a plaintiff in the action against him and that would not have benefited Mr. Rose at all. Rather, his legal argument was that PMI had to wait until FSA completed its remedies against the FSA Borrowers before PMI could pursue this action. (Tr. [Rose] at 269.) The object was to avoid PMI being able to obtain summary judgment. (Tr. [Rose] at 268–69.)

85. On or about January 28, 1992, defendants Rose and Cohen filed a motion to dismiss this adversary proceedings in which they set forth in detail their legal argument as to why the Intercreditor Agreement rendered PMI's action to collect under the Amended Guaranty premature. (*See* FSA Exh. 84.) The gist of the legal theory asserted by Rose and Cohen as a defense was that this action by PMI was premature because no amount under the PMI Loan was yet "due and owing" to PMI because the standstill provision in the Intercreditor Agreement prohibited PMI from pursuing any recovery on the underlying debt. (*See* FSA Exh. 85 at 9–10; FSA Exh. 84 at 8–9.)

86. During the first part of 1992, Mr. Rose and his attorneys on several occasions asked FSA to intervene in this action on their behalf. (Tr. [Dorian] at 643–44, 646–47; Tr. [Rose] at 266–69; PMI Exh. 48 at 3; PMI Exh. 49.) During this time period, FSA had available the advice of two sophisticated law firms: Rogers & Wells, who had advised it under the FSA Loan transaction, and O'Melveny & Myers, who FSA had retained to advise it in the face of the eminent default of the FSA Loan. Both firms were fully familiar with the Intercreditor Agreement. (*See* Tr. [Utley] at 506; Tr. [Dorian] at 646–47, 51.) FSA refused to adopt the position being urged upon it by the attorneys for Rose and Cohen. (Tr. [Rose] at 267.)

87. During late 1991 and early 1992, PMI and the other Prime Debtors negotiated a Plan of Reorganization (the "Plan") which specifically relied upon the PMI Loan as a substantial source of value to the estate. (Tr. [Elwood] at 386–87.) Prime valued the PMI Loan at approximately $70 million. (Tr. [Elwood] at 387–89.) In arriving at this valuation, Prime excluded from its recovery analysis the FSA Borrowers and their assets because of the Intercreditor Agreement. (Tr. [Elwood] at 387.) Prime disclosed and discussed with the Unsecured Creditors Committee, including its lawyers and professional advisors, as well as with other substantial creditor groups, both its analysis and the litigation by PMI to recover under the Amended Guaranty. (Tr. [Elwood] at 389–90.) Indeed, the official committees received copies of the pleadings and motions filed in this adversary proceeding. (Tr. [Elwood] at 409–11; *see also* Tr. [Elwood] at 442–44.)

88. In its Disclosure Statement For Debtors' Second Amended Joint Plan or Reorganization, dated January 16, 1992 (the "Disclosure Statement"), Prime disclosed that it had commenced this action to recover under the Amended Guaranty. (PMI Exh. 47 at 80.) Prime also disclosed that it was pledging the PMI Loan as the single largest piece of collateral supporting the approximately $161 million in senior and junior notes which were to be issued under the Plan. (PMI Exh. 47 at Ex. VIII.)

89. FSA failed to assert any objection to the Disclosure Statement. The Disclosure Statement was approved by this Court by Order dated February 13, 1992. (Tr. [Elwood] at 389–90; PMI Exh. 47.) Thereafter, a hearing on confirmation of the Plan was scheduled for April 2, 1992. FSA did not object to confirmation of the Plan. (Tr. [Elwood] at 391–92.) The Plan was approved by this Court by Order dated April 3, 1992. (Tr. [Elwood] at 392; PMI Exh. 51.)

90. It was not until July 20, 1992, over seven months after PMI first informed FSA it was commencing this action and several months after confirmation of the Plan, that FSA informed PMI for the first time that it was considering taking the position that it was entitled under the Intercreditor Agreement to any recovery PMI received in this action against Rose and Cohen. (Tr. [Elwood] at 392–93.) At trial, FSA provided no explanation for its change of heart or its substantial delay in acting.

91. In adopting such a position, FSA in effect took the potential for ambiguity in the Intercreditor Agreement, which had first

been identified by the attorneys for Rose and Cohen for use as a defense in this action, and refined it to its benefit. Under FSA's newly adopted view, not only was the PMI action premature, but, in fact, any recovery by PMI would belong to FSA. FSA retained new counsel to pursue such action.

92. The Court finds that FSA's delay of over seven months before asserting any claim in this action, its failure to object to the Disclosure Statement, and its failure to object to confirmation of the Plan, was because FSA during such time period did not believe that it had any right under the Intercreditor Agreement to assert a claim for the proceeds that PMI might obtain under the Amended Guaranty. The reason FSA finally belatedly decided to adopt its new interpretation of the Intercreditor Agreement was unexplained at trial. However, it is clear to this Court that FSA came to adopt such a conclusion only after being made aware of a possible ambiguity in the Intercreditor Agreement by the actions of Rose and Cohen's attorneys. Absent such a creative argument on the behalf of Rose and Cohen's attorneys, FSA likely would not have asserted any rights to PMI's recovery in this action because left to its own view it did not believe that it legitimately had any such right to assert.

iii. *The FSA Debtors Bankruptcy Proceeding*

93. On or about March 10, 1992, FSA and the FSA Borrowers entered into a settlement agreement (the "FSA Settlement Agreement") in respect of the FSA Loans. (PMI Exh. 50). The Settlement Agreement provided, *inter alia,* that:

1. The FSA Borrowers shall file petitions under Chapter 11 of Bankruptcy Code in the United States District Court for the Southern District of New York and, concurrently with such filings, each FSA Borrower would file either a plan of reorganization or a joint plan of reorganization acceptable in all respects to FSA as further set forth therein;

2. The FSA Borrowers each shall convey all its right, title and interest in the FSA Collateral (as defined therein) to FSA (or its designee) free and clear of all liens, claims, security interests, assignments, encumbrances and other interest of any kind;

3. The plan of reorganization shall provide that, except with FSA's consent, no property of the FSA Borrowers would be distributed to, or received or retained by, unsecured or contingency creditors in respect of their claims, except for the payment of allowed administrative claims; and

4. The FSA Borrowers' obligations to FSA under the FSA Loans will be released and discharged.

(PMI Exh. 50.)

94. On March 24, 1992, Livonia, Pennco Hotel, PNP, R/C Hotel and Southeast Hotel (the "FSA Debtors") filed chapter 11 petitions with the Bankruptcy Court in White Plains, New York (the "FSA Debtors Bankruptcy"). (*See* PMI Exh. 1 at 6; FSA Exh. 104 at ¶ 6.)

95. FSA Borrower Hauppauge Hotel, while initially required by the FSA Settlement Agreement to file a petition and plan of reorganization, did not do so, with the consent of FSA, because Hauppauge Hotel's sole asset, consisting of a leasehold interest in the Hauppauge Holiday Inn, had been foreclosed by the senior lender on or about December 31, 1991. As a result of such foreclosure, Hauppauge Hotel had no assets. (*See* PMI Exh. 1 at ¶ L; PMI Exh. 53 at 2; FSA Exh. 104 at ¶ 6.)

96. On or about May 22, 1992, PMI filed claims (the "PMI Claims") against debtors, Southeast Hotel Associates, R/C Hotel and Pennco Hotel in the FSA Debtors Bankruptcy for amounts owed under the PMI Loan in the amount of approximately $120 million. (*See* PMI Exh. 56.)

97. On December 15, 1992, the Bankruptcy Court in the FSA Debtors Bankruptcy entered an Order Confirming Debtors' Amended Joint Plan Of Reorganization (the "FSA Debtors' Plan"). The FSA Debtors Plan recited, *inter alia,* that:

1. All of the FSA Debtors' property, real and personal, including but not limited to such debtors' interest in their ho-

tels, was collateral (the "FSA collateral") pledged to FSA under the FSA Loans;

2. The indebtedness of the FSA Debtors to FSA in the principal amount of approximately $114,286,188 secured by the FSA Collateral was substantially more than the maximum fair market value of the FSA Collateral;

3. Events of default had occurred under the FSA Loans and the FSA Debtors had determined that no equity exists in its FSA Collateral beyond the amount owed to FSA; and

4. Accordingly, it is in each FSA Debtor's best interest by means of the plan of reorganization to effectuate, *inter alia*, the orderly conveyance of the FSA Collateral to FSA (or its designee) and obtain the release and discharge of the FSA Debtors' obligations under the FSA Loans to FSA.

(PMI Exh. 1 at ¶ N; FSA Exh. 104 at ¶ 8.) The FSA Debtors' Amended Plan of Reorganization became effective on or about December 15, 1992.

98. The FSA Debtors' Plan provides that the obligations owed to PMI under the PMI Loan by Borrowers Southeast Hotel Associates, R/C Hotel and Pennco Hotel were extinguished and discharged. (PMI Exh. 54 at 6–7; PMI Exh. 1 at ¶ O.) The PMI Claims were held to be valued at zero, and no distribution of any kind was made to PMI in respect of its claims. (*Id.;* Tr. [Elwood] at 394–95.)

99. FSA also resolved all its claims against Rose and Cohen in respect of the FSA Loan. As previously noted, Rose and Cohen had provided FSA with additional collateral in support of the FSA Loan pursuant to the R & C Collateral Guaranty. Pursuant to that agreement, Rose and Cohen had pledged to FSA the Zero Coupon Security and Letter of Credit. (*See* PMI Exh. 38.)

100. During the negotiations with FSA regarding the defaults under the FSA Loan, FSA agreed not only to release Rose and Cohen from all claims in connection with the FSA Loan, including any claim under the R & C Collateral Guaranty, but to return to Rose and Cohen $4.5 million that FSA had drawn under the Letter of Credit. (Tr. [Rose] at 263–64; PMI Exh. 50 at 13–14.) Having provided Rose and Cohen with a release of their liability to FSA in connection with the FSA Loan, it appears to this Court as fundamentally unfair for FSA to now attempt to reassert a claim against them under the rubric of the personal Guaranty that they separately had provided to PMI.

101. As a result of the FSA Settlement Agreement and the Confirmation of the FSA Borrowers Plan, the FSA Borrowers debt to FSA has been discharged. FSA had been able to fully exhaust every right and remedy it had under the FSA Loan, including the receipt of all the property of the FSA Borrowers. Moreover, because of the Intercreditor Agreement, PMI has received no payments or distributions of any kind either directly or indirectly from the FSA Borrowers or out of their assets.

102. As a result of the FSA Borrowers Plan, the FSA Borrowers debt to PMI under the PMI Loan also has been extinguished. The PMI Loan remains outstanding today only as a debt owed by the borrowers Northeast and Universal. In addition, PMI retains the rights under its Amended Guaranty.

iv. *The PMI/Rose Settlement Agreement.*

103. Prime Hospitality Corp. (successor-in-interest to Prime Motor Inns, Inc. and PMI) (collectively, "Prime"), Rose and Cohen have reached a settlement of their dispute which is embodied in a Consolidated And Amended Settlement Agreement, dated October 12, 1993 (the "Settlement Agreement") (PMI Exh. 1.) Under the terms of the Settlement Agreement, Prime is selling the PMI Loan (including all rights under the Amended Guaranty) to Northeast Hotel Corp., an entity wholly owned by Rose in return for a payment (the "Settlement Payment") consisting of (a) $25 million in cash and (b) the net cash proceeds from the sale of approximately 950,000 shares of stock owned by Rose. (PMI Exh. 1 at 10–11.) The total value of the Settlement Payment is approximately $30 to $32 million (Tr. [Elwood] at 375, 380.)

104. The Settlement has been structured as a sale in order to accommodate certain

corporate and tax requirements of Mr. Rose. (Tr. [Rose] at 271–73; Tr. [Elwood] at 376.) The cash for the Settlement is coming from (i) $8 million from the sale of a hotel owned by Universal which was pledged as security for the loan; (ii) $17 million from a personal loan Mr. Rose is obtaining from Chemical Bank and (iii) an estimated $5 to $7 million from the sale of stock owned by Mr. Rose. (Tr. [Rose] at 269–70; Tr. [Elwood] at 375–76.) In order to obtain the cash for the Settlement, Mr. Rose has had to pledge most of his assets to Chemical Bank. (Tr. [Rose] at 271.)

105. PMI engaged in substantial "due diligence" in order to assure itself that the Settlement was reasonable given the financial condition of the guarantors and the available assets. PMI retained the accounting firm of Kenneth Leventhol & Co. to perform an analysis of the financial condition of Mr. Rose and his related entities. (Tr. [Elwood] at 380–81; *see also* Tr. [Elwood] at 405.) PMI also retained the firm of Kroll & Associates in order to provide it with some assurance that there was not undisclosed assets. (Tr. [Elwood] at 381–82.) On the basis of all the evidence presented at trial, the Court finds that the Settlement is fair.

### CONCLUSIONS OF LAW

106. The dispute that is to be resolved by this Court involves the interpretation of the Intercreditor Agreement and, to some extent, the Amended Guaranty. PMI contends that the proper interpretation of the Intercreditor Agreement is that its scope is limited to affecting PMI's rights against the FSA Borrowers and with respect to the property of such borrowers. FSA contends that the Intercreditor Agreement should be interpreted to affect PMI's rights as to any and all of the PMI Borrowers, regardless as to whether or not they are also borrowers under the FSA Loan, and also covers any rights PMI may have against Rose and Cohen under their $50 million personal Guaranty.

9. The Intercreditor Agreement, PMI Loan, Guaranty and FSA Loan all provide that they are to be governed by the law of the State of New York.

*A. The Dispute over the Interpretation of the Intercreditor Agreement*

107. The issue of whether or not a contract is ambiguous is a threshold issue to be determined by the Court. *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) [9]. Where a contract, read as a whole, is clear, complete and unambiguous on its face, the contract will be enforced according to its terms. *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990); *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir. 1990) ("contract language is not ambiguous if it has a 'definite and precise meaning, unattended by danger of misconception ... and concerning which there is no reasonable basis for a difference of opinion.'") (citations omitted). In such a case, evidence "outside the four corners of the document" will not be admitted. *W.W.W. Assocs., Inc.,* 77 N.Y.2d 157, 565 N.Y.S.2d at 443, 556 N.E.2d at 642. Moreover, "extrinsic and parol evidence is not admissible to create an ambiguity" in an otherwise unambiguous written agreement. *Id.* (citation omitted).

108. Where the language of a contract is ambiguous, parol evidence is admissible to aid in its interpretation. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990). A contract is ambiguous "where a natural and reasonable reading of its language allows for two or more possible meanings." *Roberts v. Consolidated Rail Corp.,* 893 F.2d 21, 24 (2d Cir.1989); *Curry Road Ltd.,* 893 F.2d at 511. In such cases, the courts may look to the surrounding facts and circumstances to determine the intent of the parties. *Roberts,* 893 F.2d at 24.

109. As the New York Courts have repeatedly held in interpreting contracts, "in searching for the probable intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their 'fair and reasonable meaning'". *Sutton v. East River Sav. Bank,* 55 N.Y.2d 550, 450 N.Y.S.2d 460, 463, 435 N.E.2d 1075, 1078 (1982) (citation omitted).

(*See* Intercreditor Agreement, PMI Exh. 6 at 11; PMI Loan, PMI Exh. 2 at 54; Guaranty, PMI Exh. 3, at 8; FSA Loan, PMI Exh. 36 at 105.)

Due consideration "must be given to the purpose of the parties in making the contract" because a "fair and reasonable interpretation, consistent with that purpose, must guide the courts in enforcing the agreement." *Cromwell Towers Redevelopment Co. v. Yonkers,* 41 N.Y.2d 1, 390 N.Y.S.2d 822, 826, 359 N.E.2d 333, 337 (1976). Moreover, as the New York courts have emphasized, "contracts are made by real people about real transactions and they should be interpreted in accordance with their reasonable intentions at the time." *Greenwich Village Assocs. v. Salle,* 110 A.D.2d 111, 493 N.Y.S.2d 461, 463 (1st Dep't 1985).

### i. *Interpretation in the Absence of Extrinsic Evidence*

■ 110. The Court finds that upon examination of the Intercreditor Agreement as a whole, but without the consideration of any extrinsic or parol evidence, that the Intercreditor Agreement is ambiguous. In other words, a review of the contract language alone does not solve the problems presented by the conflicting interpretations offered by FSA and PMI.

111. The Court concludes that PMI's position is a fair and reasonable interpretation of the Intercreditor Agreement.[10] The Intercreditor Agreement begins with recitals and basic definitions which make it appear that its intended scope was limited only to those entities that were borrowers under both the PMI Loan and the FSA Loan.

112. Thus, the Intercreditor Agreement begins with a recital which defines the PMI Loan and lists all of the PMI borrowers. The Intercreditor Agreement at Recital A provides as follows:

A. PMI, Southeast Hotel Associates, Northeast Hotel Associates, Universal Motor Lodges, Inc., R/C Hotel Associates, Hauppauge Hotel Corp. and Pennco Hotel Corp. have entered into the Amendment and Restatement dated as of February 11, 1988, as amended on November 6, 1989 (the "Prime Agreement"), pursuant to which PMI has made and may from time

to time continue to make certain loans to the parties thereto.

This definition also acknowledges that PMI "may from time to time continue to make certain loans to the parties thereto". (PMI Exh. 6 at Recital A.)

113. The Intercreditor Agreement then defines the term "Borrowers" for purposes of the Intercreditor Agreement to mean *only* those entities that are borrowers under the FSA Loan, *i.e.,* the FSA Borrowers. Recital B defines "Borrowers" as follows:

B. Southeast Hotel Associates, R/C Hotel Associates, Hauppauge Hotel Corp., Pennco Hotel Corp., Livonia Realty Inc. and PNP General Partner, Inc. (collectively, and with their respective successors and assigns, the "Borrowers") have entered into the Loan and Security Agreement (the "Loan Agreement") dated as of the date hereof with the Issuer.

The Intercreditor Agreement thereby excludes from its definition of Borrowers both Northeast and Universal, as these two entities are only borrowers under the PMI Loan.

114. The Intercreditor Agreement at Recital D then sets forth a statement of its purpose as follows:

D. PMI and the Senior Lenders [FSA] desire to set forth certain of their respective rights against the [FSA] Borrowers and with respect to the property of the [FSA] Borrowers.

115. PMI's interpretation of the Intercreditor Agreement as intended only to address FSA's and PMI's respective rights as to the four common Borrowers under their two loans is also consistent with the Intercreditor Agreement's definition of Subordinated Indebtedness, which is the indebtedness that is to be subject to the restrictions of the Agreement. Notably, the Intercreditor Agreement does not define Subordinated Indebtedness as the debt owed by the PMI Borrowers to PMI under the PMI Loan. Instead, the Intercreditor Agreement uses a much narrower definition, providing that:

1.5 "Subordinated Indebtedness" means all obligations of the [FSA] Borrow-

---

**10.** Indeed, even Mr. Utley, counsel for FSA, conceded that PMI's interpretation was at least a reasonable interpretation. (Tr. [Utley] at 581–82.)

ers under or arising out of transactions relating to or contemplated by the Prime Agreement [PMI Loan], the Management Contracts and any Extension Loans from time to time. This definition of Subordinated Indebtedness expressly refers to the obligations which the FSA Borrowers owe to PMI under the PMI Loan; it thereby reasonably appears not to include obligations owed by the non-FSA Borrowers Northeast and Universal to PMI.

116. Similarly, the Intercreditor Agreement specifically defines the term "Management Contracts" to have the same meaning as that set forth in the PMI Loan. (*See* PMI Exh. 6 at Section 1.2.) Under the PMI Loan, one method by which the PMI Loan could be repaid was by the delivery to PMI of Management Contracts pursuant to which PMI would be granted a payment equal to a fixed percentage of the revenue of a particular borrower's hotel property. (Tr. [Bingham] at 196.) Indeed, the definition of Subordinated Indebtedness acknowledges such method of payment and expressly includes any payment by an FSA Borrower to PMI in the form of Management Contracts as within the definition of Subordinated Indebtedness. (*See* PMI Exh. 6 at Section 1.5.)

117. What is obviously completely absent from the Intercreditor Agreement is any reference to payments that may be made by Northeast, Universal or the guarantors. Indeed, while the Intercreditor Agreement specifically defines and includes payment by the FSA Borrowers in the form of Management Contracts, which itself demonstrates a sophisticated familiarity with the PMI Loan, it fails to make any mention of the $50 million Rose and Cohen personal Guaranty.

118. The Intercreditor Agreement having defined its key terms, PMI's interpretation of the subordination provisions as intended only to restrict its rights as to the FSA Borrowers and their property unless and until FSA was first fully repaid thus appears to be a reasonable interpretation of the agreement. Section 2.2 contains the key subordination provision and provides as follows:

2.2 Anything in the Subordinated Indebtedness notwithstanding, all payments of or in connection with the Subordinated Indebtedness are and shall be expressly subordinate and junior in right of payment and exercise of remedies to the prior payment in full of the Senior Indebtedness to the extent and in the manner provided herein, and the Subordinated Indebtedness is hereby subordinated as a claim against the Borrowers or any of the assets of the Borrowers to the prior indefeasible payment in full of the Senior Indebtedness, whether or not such claim is in connection with a Reorganization.

In furtherance of the foregoing, the Borrowers will not make, and PMI will not accept, any payment of or on account of Subordinated Indebtedness, whether such payments are made or attributable to any Borrower or any successor in interest before, during or after a Reorganization and whether such payments are attributable to principal, premium, if any, interest or other amounts (including any fees, expenses, distributions on a claim against any Borrower, payment in a Reorganization intended to protect the interest of PMI with respect to the Subordinated Indebtedness, or any distributions to PMI in a Reorganization with respect to the Subordinated Indebtedness), until all the Senior Indebtedness has been indefeasibly paid in full in cash; . . . . [11]

119. A natural and reasonable interpretation of this provision, in the context of the entire document, is that PMI was subordinating its rights against "the [FSA] Borrowers and any of the assets of the Borrowers". Such subordination was to include any payments by "any [FSA] Borrower or any successor in interest", whether made before, during or after a Reorganization, and was specifically meant to include payments made in the context of a Reorganization, such as "any fees, expenses, distributions on a claim against any Borrower, payments in a Reor-

---

**11.** For ease of reference, the Court has inserted space between the two sentences of this provision.

ganization intended to protect the Subordinated Indebtedness, or any distributions to PMI in a Reorganization with respect to the Subordinated Indebtedness". These last listed payments, while not technically ones being made by a Borrower or a successor in interest, were nonetheless "on account of" the Subordinated Indebtedness and were out of the assets or property of such Borrower's estate.

120. PMI's interpretation of the Intercreditor Agreement is also reasonable in light of the purpose of the Agreement. As FSA was not lending any money to Northeast or Universal, it would not appear for there to be any reason for PMI's rights as to these two entities to be subject to the restrictions of the Intercreditor Agreement. This is also reflected in the prohibition found in Section 5 of the Intercreditor Agreement whereby PMI agreed that during a stated time period it would not "commence or join a cause involving the [FSA] Borrowers or the Issuer." (PMI Exh. 6.) This Intercreditor Agreement provided no restriction as to PMI from so acting against Northeast or Universal.

121. FSA offers a counter interpretation. FSA contends that the Intercreditor Agreement's definition of Subordinated Indebtedness should be read to include the obligations of all the PMI Borrowers under the PMI Loan. FSA acknowledges that the Intercreditor Agreement's definition of Borrower does not on its face include either Northeast or Universal. FSA also acknowledges that the Intercreditor Agreement does not define Subordinated Indebtedness as the entire PMI Loan. Nevertheless, FSA argues that this is not fatal because the obligations of PMI borrowers Northeast and Universal are joint and several with the obligations of Southeast Hotel Associates and the other FSA Borrowers. Accordingly, it is FSA's view that the Intercreditor Agreement's definition of Subordinated Indebtedness as meaning the obligations of the FSA Borrowers to PMI should in fact be read also to include the obligations of Northeast and Universal.

122. As to the scope of the subordination, FSA places heavy emphasis on the phrases "in connection with" and "on account of" that

are found in Section 2.2 and the phrase "as protection for" which is found is Section 2.3. FSA seeks to explain the absence of any direct reference to payments by Northeast, Universal or the guarantors as unnecessary. According to FSA, because any payment by Northeast, Universal or the guarantors is either "in connection with", "on account of", or "as protection for" the Subordinated Indebtedness, then all such payments are to be covered.

123. The Court finds FSA's interpretation to be impermissibly predicated upon a selective reading of the Intercreditor Agreement isolating some clauses in sentences while ignoring other clauses in the same sentence. *See S & S Media, Inc. v. Vango Media, Inc.*, 84 A.D.2d 356, 446 N.Y.S.2d 52, 54 (1st Dep't 1982) ("words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby"). Moreover, FSA's interpretation appears to be difficult to accept upon a reading of the Intercreditor Agreement in its totality.

124. For example, FSA places great emphasis on the phrase "in connection with" that appears in the first sentence of Section 2.2. But FSA's interpretation ignores that this same sentence then goes on to expressly provide that the scope of the subordination being agreed upon is "to the extent and in the manner provided herein". The terms used in this second phrase are words of limitation and require that one look to the following provisions and the entire document to determine exactly what the "extent" and "manner" of the subordination is.

125. Further, this same first sentence then goes on to specifically state that the Subordinated Indebtedness is "hereby subordinated as a claim *against the [FSA] Borrowers or any of the assets of the [FSA] Borrowers*". (emphasis added) This phrase is, of course, very similar to the statement in Recital D that the purpose of the Intercreditor Agreement is for PMI and FSA to "set forth certain of their respective rights *against the [FSA] Borrowers and with respect to the property of the [FSA] Borrowers.*" (emphasis added)

126. The next sentence of Section 2.2 begins with the phrase, "[i]n furtherance of the foregoing, *the [PMI] Borrowers* will not make, and PMI will not accept, any payment of or on *account of* ..." the Subordinated Indebtedness. (emphasis added) While FSA in its argument emphasizes the words "on account of", when examined in the context of the entire sentence it appears an awkward way to state that payments by a guarantor are being referred to, especially considering that the sentence begins with the phrase "the Borrowers will not make ...". The phrase "on account of" appears more naturally to refer to the long list of payments that are included in the parenthetical at the end of this sentence, which are various types of payments that may be made in the context of a Reorganization proceeding. These payments, such as adequate protection payments or distributions on a claim, are payments not technically made by the Borrower, but most certainly are "on account of" the underlying debt and have as their source the assets and property of the Borrower's estate.

127. Finally, the phrase "as protection for" upon which FSA relies is not found in Section 2.2 at all. Instead, that phrase is found in Section 2.3.1, a section that deals with payments made in the event of a Reorganization. When read in context, it is completely unreasonable to interpret that phrase as referring to payments by Northeast, Universal or the guarantors. Rather, the only reasonable interpretation of that phrase is that it refers to adequate protection payments which a secured lender may receive under Section 361 of the Bankruptcy Code.

128. In summary, while the Court finds that PMI's interpretation is the more fair and reasonable meaning, the Court will accord FSA the benefit of the doubt and find that its interpretation is a possible reading of the Intercreditor Agreement. Accordingly, the Court will consider extrinsic evidence in order to determine the intent of the parties.

ii. *The Consideration of Extrinsic Evidence*

129. Having found the Intercreditor Agreement ambiguous, the Court is now to look to the "surrounding facts and circumstances to determine the intent of the parties". *Yonkers Racing Corp. v. Catskill Regional Off–Track Betting Corp.*, 159 A.D.2d 615, 552 N.Y.S.2d 670, 675 (2d Dep't 1990). More specifically, the Court may consider evidence as to the statements and representations made during the process of negotiating the agreement. *See Pantone, Inc. v. Esselte Lestraset, Ltd.*, 878 F.2d 601, 605 (2d Cir.1989); *Gerlach v. Horn & Hardart Co.*, 683 F.Supp. 342, 344–45 (S.D.N.Y.1988); *Mister Filters, Inc. v. Weber Envtl. Sys.*, 44 A.D.2d 639, 353 N.Y.S.2d 835, 837 (3d Dep't 1974). The Court may also consider the actions and conduct of the parties subsequent to execution of the contract. *See Ocean Transport Line, Inc. v. American Philippine Fiber Indus., Inc.*, 743 F.2d 85, 90–91 (2d Cir.1984); *Pikul v. Clough, Harbour & Assocs.*, 190 A.D.2d 932, 593 N.Y.S.2d 585, 587 (3d Dep't 1993).

130. As has been extensively discussed in this Court's Findings of Fact, upon consideration of the extrinsic evidence, the overwhelming evidence at trial was that the intent of the parties was that the Intercreditor Agreement was to restrict PMI's rights only as to the FSA Borrowers and their property. Upon consideration of all the evidence, this Court finds that FSA did not request from PMI, and PMI did not grant to FSA, any restriction on PMI's right to recover against either Northeast and Universal, including their 40 hotels, or against Rose and Cohen under their personal Guaranty.

131. The Court will not repeat here its findings of fact which support such conclusion. However, it is important to point out that such findings of intent are supported not only by the credible testimony of the witnesses at trial[12], but also by the contemporane-

---

**12.** FSA in support of its interpretation relies, in part, on conclusions drawn by Charles Kotick at his deposition. Mr. Kotick was the attorney who helped Mr. Rose identify a potential "ambiguity" in the Intercreditor Agreement to serve as a defense to this action. (*See* FSA Exh. 84 at 19.)

In light of the prior pleading filed by Mr. Kotick, it is understandable that Mr. Kotick did not fully abandon his legal conclusions when he was deposed by FSA. However, Mr. Kotick at his deposition made it clear that he had no recollection of the discussions in 1989 regarding the negotiation

ous documents and actions of FSA. Moreover, FSA did not offer any persuasive evidence that its intent at the time was contrary to that of PMI's.

132. Thus, for example, PMI's interpretation of the Intercreditor Agreement is fully consistent with the description of the Intercreditor Agreement that is found in FSA's internal Final Executive Summary. (PMI Exh. 27.) This is an important document in and of itself because it was given to senior management committees within FSA, as well as to the rating agencies. If FSA believed it had any right under any circumstances either to payments by Northeast and Universal, who owned 40 hotels, or to payments under a $50 million Guaranty, then surely there would be some mention of these rights in this document.[13]

133. Similarly, PMI's interpretation is consistent with the description of FSA's rights as found in the Private Placement Memorandum, a document which Rogers & Wells helped prepare, whose purpose was to raise the money for the FSA Loan. (*See* PMI Exh. 33.) Since this was, as Mr. Utley testified, a "selling document", there would appear to be all the more reason to disclose to the potential bond purchasers these additional potential sources of payment.

134. FSA's interpretation, on the other hand, is inconsistent with these documents. If FSA believed at the time that it had additional sources of payment for its loan other than its FSA Borrowers and their hotels and assets, then this leaves unexplained why FSA would fail to disclose in either its internal Final Executive Summary or the Private Placement Memorandum that under certain circumstances it also had available to it two more entities, Northeast and Universal, 40 hotel properties, and a $50 million Guaranty as potential sources of payment.

135. FSA's conduct both during the negotiations and after execution of the Intercreditor Agreement also supports PMI's position. As previously found, it is undisputed that FSA knew during the negotiations that PMI was demanding that Rose and Cohen amend their personal Guaranty in return for PMI agreeing to sign the Intercreditor Agreement. It is also undisputed that even though FSA knew that the Guaranty was being amended, it neither voiced any objection or even asked for a copy of the amendment. Indeed, Mr. Utley testified that as far as FSA was concerned PMI and Rose could have agreed just to "tear it up". (Tr. [Utley] at 631.) Such conduct is strong evidence that FSA believed the Rose and Cohen Guaranty was simply irrelevant to FSA and none of its concern.

136. Similarly, FSA's conduct after the execution of the Intercreditor Agreement is consistent with PMI's position and totally inconsistent with the position it now seeks to adopt as its own. As previously found, FSA was on notice by December 1991 that PMI intended to pursue Rose and Cohen to collect under the Amended Guaranty and of the argument advanced by them in defense. Indeed, Rose's attorney actively lobbied FSA to intervene in this action. (Tr. [Dorian] at 644–47.)

---

of the Intercreditor Agreement (Kotick Dep. Tr. at 61–62, 67–69, 71–73, 78–80, 89–92, 96–97, 110, 113, 115, 126, 132, 267–68, 286–87) and that he did not know what the intent of FSA or PMI were. (*Id.* at 81–82, 114.) Mr. Kotick's recollection of facts was vague and limited. (*See* Kotick Dep.Tr. at 166–71, 175, 177, 207, 292, 418.) To the extent he did recall anything, he believed that FSA had no interest in the Amended Guaranty. (*See* Kotick Dep.Tr. at 177, 420.) Indeed, Mr. Kotick, like Mr. Utley, testified that FSA would not care if the Guaranty was simply "torn up". (*Id.* at 417–18; *see* Tr. [Utley] at 631.)

13. FSA relies in part upon a letter written by Mr. Utley, dated September 13, 1989 (PMI Exh. 20), that also was sent to the rating agencies. If this letter had the meaning FSA seeks to apply to it, then there is no explanation why the Final Executive Summary did not include any statement of any kind indicating that FSA had rights under the Intercreditor Agreement to payments by Northeast, Universal or under the Guaranty. In fact, the September 13 letter does not directly address the issue of whether payments by Northeast, Universal or the guarantors belonged to FSA. Instead, the letter itself is quite ambiguous and general. Indeed, the letter's final paragraph is written in a way that appears to assume that PMI *would* be able to pursue the guarantors and retain the proceeds they received thereunder in the event of a default under its loan and in this respect is further evidence in favor of PMI's position. (*See* PMI Exh. 20 at 3.)

137. If FSA believed that it had a right to collect up to $50 million it would be reasonable to expect that it would immediately have acted. Instead, it refused Rose's request to intervene. Moreover, despite being on notice that Prime had pledged the PMI Loan as security for the Senior and Junior notes under the Plan, money which FSA now asserts it believes belongs to it, FSA failed to file any objections either to the Disclosure Statement or to confirmation of the Plan. (Tr. [Elwood] 391–92.)

138. Finally, it is clear that a subordination agreement does not as a matter of law prevent PMI from recovering against the guarantors. *See Standard Brands Inc. v. Straile,* 23 A.D.2d 363, 260 N.Y.S.2d 913 (1st Dep't 1965); *Cantor v. Newton,* 4 Mass.App. Ct. 686, 358 N.E.2d 247 (1976). As the courts have recognized, and as was in fact the case here, a subordinated creditor may well insist on a separate personal guaranty precisely because its rights against the subordinated borrower are being restricted by a subordination agreement.

139. In *Cantor v. Newton,* 4 Mass.App. Ct. 686, 358 N.E.2d 247 (1976), for example, the borrower, Investment Funds Inc. ("IFI"), had issued both subordinated and senior notes. Goodman, a stockholder in IFI, personally guaranteed the subordinated notes. *Id.* 358 N.E.2d at 249. The senior noteholders sued claiming that if certain clauses in the subordination agreement were broadly construed they covered any payment made by Goodman pursuant to his personal guaranty.

140. The appellate court in *Cantor* disagreed. The appellate court stated that the senior lender's argument appears to be one that gives broad meaning to certain isolated phrases while ignoring other language in the same paragraphs. *Id.* at 254. In rejecting this approach, the appellate court held that in construing the language of a subordination agreement, the "intent of the parties must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part." *Id.* at 254–55.

141. After noting that, like the instant case, the personal guaranty was given only to the creditor of the subordinated note, the appellate court concluded that the provisions of the subordination agreement "were intended to be confined in their application to payments which might be received by the subordinated noteholders from or out of the assets of IFI [the subordinated borrower]." *Id.* at 255. In light of this, the court was "unable to conclude that the subordination provisions of these notes were intended to apply to a situation like the present, in which the holders of the subordinated notes are to receive payment out of the assets of someone other than the maker of the notes". *Id.*

142. The *Cantor* court concluded as follows:

> To reach a contrary conclusion would be to hold, in effect, that a subordinated noteholder could never realize upon a third party guaranty that his note will be paid. We do not think the law requires or contemplates any such result.

*Id.* at 255.

143. Similarly, in *Standard Brands v. Straile,* 23 A.D.2d 363, 260 N.Y.S.2d 913, 915 (1st Dep't 1965), a guarantor sought to assert a subordination agreement as a defense to payment on a guaranty. The creditor contended that the subordination agreement only restricted its rights as to the borrower's assets and did not in any way affect its rights against the guarantor. The court in *Standard Brands* agreed.

144. The court explained that the junior or subordinated creditor may place its reliance on a personal guaranty as security for the loan precisely because the subordination impairs its rights against the principal debtor's assets. *Id.,* 23 A.D.2d 363, 260 N.Y.S.2d at 917. In granting the creditor's motion for summary judgment against the guarantor, the *Standard Brands* court explained as follows:

> Although plaintiff's rights with respect to a senior creditor may be uncertain, this very uncertainty demonstrates the importance to plaintiff of Straile's personal guaranty. In that guaranty, which is itself free from ambiguity, Straile unconditionally undertook that the note would be promptly paid regardless of the enforceability of the note by plaintiff against the corporate defen-

dant, Straile's principal. Consequently, even if one assume that the subordination agreement prevents suit by the junior creditor against the debtor while it is in default to the senior creditor, it does not follow that the guarantor is similarly immune from suit.

260 N.Y.S.2d at 917.

■ 145. The cases FSA relies upon are not to the contrary. Rather, they simply emphasize that a subordination agreement is a contract and is to be interpreted like any other contract. *See In re Leasing Consultants, Inc.,* 2 B.R. 165, 169 (Bankr.E.D.N.Y. 1980).[14] The intent of the parties governs.

146. Finally, the Court finds that because FSA knew or should have known of PMI's interpretation of the Intercreditor Agreement it is bound by that interpretation. Because FSA specifically knew that PMI was insisting that Rose and Cohen provide it with an amended personal guaranty as the price for PMI's consent to the Intercreditor Agreement, FSA knew or should have known that PMI believed that any payment received by it under that Amended Guaranty was not subject to and was outside the scope of the Intercreditor Agreement.

■ 147. As the Supreme Court held in *United States v. Stuart,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989), it is "hornbook contract law that the proper construction of an agreement is that given by one of the parties when 'that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.'" *United States v. Stuart,* 489 U.S. 353, 368 n. 7, 109 S.Ct. 1183, 1191 n. 7, 103 L.Ed.2d 388 (1989) (quoting Restatement (Second) of Contracts § 201(2)(b) (1981));

Court Decisions: 1st Judicial Department; New York County, *TW Services, Inc. v. Comdisco, Inc.,* N.Y.L.J., January 24, 1994 at 27. ("Because Comdisco knew or should have known of TWS's interpretation of the term ..., but TWS did not know and had no reason to know of any contrary interpretation, Comdisco is bound by TWS's interpretation"). The purpose for this rule is that "a party who makes a contract knowing of a misunderstanding is sufficiently at fault to justify his being subjected to the other party's understanding." 2 E. Allan Farnsworth, *Contracts,* § 7.9 (1990).

148. In summary, consideration of parol evidence confirms that PMI's interpretation is the natural, reasonable and correct interpretation of the Intercreditor Agreement. This is true both because PMI has established that such was the mutual intent of the parties and because FSA, having knowledge of PMI's understanding, is bound by that interpretation.

### B. *PMI's Claim for Reformation*

■ 149. PMI, in the alternative, argues that in the event that the Court were to find that the plain meaning of the Intercreditor Agreement required that FSA's interpretation be accepted, that the Intercreditor Agreement be reformed to reflect the true intent of the parties or be rescinded.

■ 150. Where a contract fails to reflect the true agreement reached by the parties, based on their mutual mistake in failing to enter into a writing reflecting their true agreement, it is appropriate that the contract be reformed to properly reflect the agreement reached by the parties. *George Backer Management Corp. v. ACME Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135,

---

14. FSA also relies upon a 1965 commentary entitled *Commentaries on Model Indenture Provisions.* This commentary, the existence of which FSA established at trial was unknown to PMI (Tr. [Bernadino] at 175), in 1965 described as "the rare case" the situation presented here where subordinated debt is guaranteed by a third party. The commentary notes that this situation creates a "special problem" and recommended that the intent of the parties be clearly expressed because "there is *a possibility* that a payment by the guarantor to the holder of the subordinated

debt" would be interpreted to be required to be paid over to the holder of the subordinated debt. In such situation, the commentary noted, the guaranty would fail in its purpose. *Id.*

If FSA knew about this commentary, then its failure to specifically address this clear potential for ambiguity is all the more puzzling. FSA established at trial that PMI was *not* aware of this 1965 commentary but never inquired as to whether FSA or its then counsel knew or relied upon this commentary at the time.

139, 385 N.E.2d 1062, 1066 (1978); *Janowitz Bros. Venture v. 25–30 120th Street Queens Corp.*, 75 A.D.2d 203, 429 N.Y.S.2d 215, 222 (2d Dep't 1980). The requisite standard of proof is a heavy one. *George Backer Management Corp.*, 385 N.E.2d at 1066.

151. PMI has established by clear, convincing and overwhelming evidence that the intent of both PMI and FSA was that the Intercreditor Agreement was intended to apply only to the FSA Borrowers and their assets. It was not the intent of the parties for the Intercreditor Agreement to restrict PMI from recovering payment from the non-FSA Borrowers Northeast and Universal or under the Amended Guaranty. Accordingly, in the alternative, the Court also grants PMI's request for reformation.[15]

C. *The PMI/Rose Settlement Agreement*

■ 152. Prime, as the successor in interest to PMI, has entered into a Settlement Agreement whereby it has, subject to certain conditions, settled its claims against Rose and Cohen. (*See* PMI Exh. 1.) Under the terms of that Settlement Agreement, Northeast Hotel Corp. ("NHC"), a corporation wholly owned by Allan Rose, is to purchase the PMI Loan, including the personal Guaranty, from PMI for a payment (the "Payment") valued at approximately $30 to $32 million.

153. The settlement is expressly conditioned, however, upon PMI's success in this declaratory judgment action with FSA. (*See* PMI Exh. 1 at ¶5.) As required by the Settlement Agreement, this Court specifically finds that (i) Prime has the sole and exclusive right to collect and retain the Payment, subject only to its obligations to the Senior and Junior noteholders under the Plan and (ii) FSA has no right, claim or interest, legal or equitable, in or to the Payment pursuant to the Intercreditor Agreement and (iii) the sale of the PMI Loan to NHC is not governed by or subject to the Intercreditor Agreement. The Court further finds that Prime has satisfied the conditions governing permission to sell the PMI Loan

as set forth in the Security Agreement, dated as of July 31, 1992, governing the collateral pledged to the Senior and Junior noteholders.

154. The Court further finds that this conclusion is true regardless as to whether the sale to NHC is viewed, as FSA argues that it should be, as simply a payment by Rose under the Amended Guaranty. Even assuming that the Payment is viewed as a payment by Rose under the Amended Guaranty, this does not affect the result. For the reasons set forth above at length, a payment under the Amended Guaranty was not intended and is not subject to the restrictions of the Intercreditor Agreement.

155. Moreover, Mr. Rose testified that the Settlement was structured as a sale for legitimate corporate and tax reasons. (Tr. [Rose] at 271–73.) Under the Intercreditor Agreement, the only restriction on a sale by PMI of the PMI Loan is in Section 2.1 which provides in part that "PMI will not sell or otherwise use or dispose of any of *the Subordinated Indebtedness* except to a person who agrees in advance, in writing, to assume and be bound by the provision of this [Intercreditor] Agreement. (*See* PMI Exh. 6.) (emphasis added)

156. Because of the FSA Borrowers' bankruptcy, the Subordinated Indebtedness once owed by the FSA Borrowers to PMI has been extinguished and discharged. (*See* PMI Exh. 54 at 9–10.) As a result, the only entities remaining who owe any debt to PMI under the PMI Loan are Northeast and Universal. The debt owed by Northeast and Universal to PMI is not Subordinated Indebtedness under the Intercreditor Agreement, and accordingly such sale is not subject to the Intercreditor Agreement.

157. Finally, the Court concludes that the Settlement is fair. Mr. Elwood testified that the settlement amount was reasonable given the financial condition of the grantors and the available assets. (Tr. [Elwood] at 380.) He also testified as to the "due diligence" that was performed as to such financial con-

**15.** In light of this determination, it is unnecessary for this Court to address PMI's claim for rescission.

dition through the retention of Kenneth Leventhal & Co. and Kroll & Associates. (Tr. [Elwood] at 381.) It also appears that Mr. Rose had to pledge most of his assets in order to obtain the loan from Chemical Bank needed for the settlement. (Tr. [Rose] at 269–71.) Accordingly, based upon all the evidence, the Court concludes that the Settlement Agreement should be approved.

### CONCLUSION

In conclusion, the Court finds that judgment should be entered in favor of PMI on its request for a declaratory judgment.

Accordingly, it is ORDERED that:

1. The Settlement Agreement is approved and the Court hereby finds that all the conditions specifically required under Paragraph 5 of the Settlement Agreement have been satisfied;

2. Judgement is to be entered in favor of PMI on its request for a declaratory judgement that the Intercreditor Agreement only applies to the FSA Borrowers and their property, and does not restrict PMI from collecting and retaining any payment made by Northeast, Universal or the guarantors. In the alternative, PMI is also granted judgement on its request for reformation;

3. FSA's Counterclaims and its Proof of Claim are denied and dismissed; and

4. Judgment may be entered accordingly.

DONE and ORDERED.

### FINAL JUDGMENT

The above action having come before this Court for trial on January 18, 19 and 20, 1994. The Court having duly considered the testimonial and documentary evidence presented, and having issued a Memorandum Decision, dated February ___, 1994, containing the Court's findings of facts and conclusions of law, and directing that judgment be entered in favor of the Plaintiff PMI Investment, Inc.

IT IS HEREBY ORDERED AND ADJUDGED that:

Final Judgment shall be entered in favor of the Plaintiff PMI Investment, Inc. ("PMI") against Defendant Financial Security Assurance Inc. ("FSA") as follows.

1. The Consolidated and Amended Settlement Agreement, dated as of October 12, 1993 (the "Settlement Agreement"), is hereby approved, ratified and confirmed by the Court.

2. Prime Hospitality Corp. as successor in interest to PMI shall have the sole and exclusive right to collect and retain the Payment as defined in the Settlement Agreement (the "Payment"), subject only to the requirements of the Debtors' Second Amended Joint Plan of Reorganization (the "Plan"). Prime has satisfied the conditions governing permission to sell the PMI Loan set forth in the July 31, 1992 Security Agreement entered into pursuant to the Plan.

3. FSA shall have no right, claim or interest, legal or equitable, in or to the Payment pursuant to the Intercreditor Agreement and the sale of the PMI Loan to Northeast Hotel Corp. is not governed by or subject to the Intercreditor Agreement.

4. The Proof of Claim of FSA against PMI, dated May 13, 1991, is hereby disallowed.

5. This Court shall retain jurisdiction over any matter relating to or arising from the Settlement Agreement or this Judgment.

DONE and ORDERED.