34 So.3d 61 (2010)
KT HOLDINGS USA, INC., etc., et al., Appellants,
v.
AKERMAN, SENTERFITT & EIDSON, et al., Appellees.
No. 3D07-1767.
District Court of Appeal of Florida, Third District.
March 24, 2010.
Rehearing and Rehearing En Banc Denied May 18, 2010.
*62 Sweetapple, Broeker & Varkas and Douglas C. Broeker, Miami, for appellants.
White & Case and Rudolph F. Aragon and James N. Robinson, Miami, for appellees.
Before RAMIREZ, C.J., and SHEPHERD and SALTER, JJ.
SALTER, J.
KT Holdings USA, Inc., and KT Trading USA, Inc., appeal a final summary judgment in favor of Akerman, Senterfitt & Eidson, P.A., and two of its attorneys in a circuit court action alleging legal malpractice. The issue is whether the law firm and lawyers negligently allowed KT Trading's recently-purchased $4.8 million private jet aircraft to become part of an asset purchase transaction. Because the salient facts were not in dispute and the controlling legal principles support summary disposition, we affirm the final summary judgment.

The Asset Purchase Transaction and the Separate Aircraft Purchase
MacKnight Smoked Foods, Inc. (Smoked Foods), operated a profitable food business. Jonathan Brown was president of Smoked Foods and president of MacKnight Holdings, Inc. (Holdings). Holdings owned all of the stock of Smoked Foods. In early 2002, Smoked Foods and Holdings entered into a letter of intent whereby Smoked Foods would sell all of its assets to MSF Acquisition Corp. (MSF).[1] Smoked Foods and Holdings retained *63 the Akerman law firm to provide legal representation to them in the transaction.
Shortly after entering into the letter of intent to sell the assets of Smoked Foods to MSF for $44,000,000, but before the closing of that transaction, Brown and other owners of Holdings decided to buy a new "Premier One" corporate jet from Raytheon. Brown did not retain Akerman or its attorneys to guide him in the negotiation of the purchase contract with Raytheon, to represent him at the closing of the $4,780,000 purchase of the jet, or to review the written conveyance document executed by Raytheon for filing with the Federal Aviation Administration. Brown did tell attorneys at Akerman that he and the other shareholders of Holdings did not want to disclose the purchase of the jet to MSF, and one or more of the Akerman attorneys told Brown that he should not place title to the aircraft in Smoked Foods.[2]
When the asset purchase transaction closedonly about two weeks after Brown closed the purchase of the aircraft in the name of Smoked Foodsthe jet was not listed on the schedule of excluded assets. The jet was purchased with funds obtained from Holdings and the shareholders of that entity, and it was never used in connection with the business of Smoked Foods. Smoked Foods never intended to sell the jet to MSF, MSF never intended to buy it, and the asset purchase price was computed on the basis of financial statements and appraisals that did not include the aircraft.
Brown and his newly-hired pilot did not deliver the aircraft to MSF following the closing, and for almost a year after closing MSF made no inquiry, much less a demand, regarding the jet. When other post-closing disputes arose between Smoked Foods and MSF in 2003, however (about eleven months following the asset purchase closing), MSF sued Smoked Foods, Holdings, Brown, and other parties in the circuit court in Tampa. MSF then learned that the jet was titled in Smoked Foods on the date of the 2002 asset purchase closing and included a claim for "recovery" of the aircraft in that Tampa lawsuit.

The Malpractice Lawsuit
In 2004, Smoked Foods and Holdings (then known by their post-closing names, KT Trading USA and KT Holdings) sued Akerman and two of its shareholders for legal malpractice in the circuit court in Miami, claiming that the defendants' legal malpractice caused KT Trading to pay millions of dollars of damages and incur legal expenses (in the Tampa litigation brought by MSF) in order to keep the aircraft. After extensive discovery, the law firm defendants moved for and obtained a final summary judgment in the Miami lawsuit. The trial court reasoned that the true cause of any losses by the KT entities regarding the aircraft was their failure to assert "mutual mistake" as an affirmative *64 defense in the Tampa lawsuit. This appeal followed.

Analysis
The issue here, just as it was below, is whether the movants for summary judgment successfully established that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law. Fla. R. Civ. P. 1.510(c); Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). Our consideration of the asset purchase transaction is governed by the parties' contractual choice of law (New York), while our analysis of the legal malpractice claim is based on Florida law.
The undisputed facts that control this analysis are:
1. The KT entities did not intend to include the new jet aircraft as part of the corporate assets being sold to MSF.
2. MSF did not intend to purchase that new jet aircraft. Indeed, MSF was completely unaware that KT Trading had acquired the aircraft until a dispute over other issues began months after the sale of assets by KT Trading to MSF. The negotiated price for the assets sold to MSF was established before KT Trading acquired the aircraft, and on the basis of appraised values and prior-period financial results that were wholly unrelated to the aircraft.
3. The president of KT Trading and KT Holdings, Mr. Brown, admitted that he made two key decisions regarding the aircraft: (1) he did not retain the Akerman law firm or its lawyers to participate with him in the closing of the purchase of the aircraft; and, (2) he placed title to the aircraft in KT Trading despite specific advice to title the aircraft in KT Holdings or in a new single-asset company.
4. Brown intended that MSF be unaware of the purchase of the multi-million dollar aircraft. An experienced business person, he understood that the purchaser of KT Trading's assets might sense additional leverage if it knew that the seller needed several million dollars for the aircraft closing right around the time of the asset sale. Adding the aircraft to KT Trading's "excluded asset" schedule in preparation for closing would have telegraphed the aircraft purchase to MSF.
5. KT Trading had record title to, and its parent company operated, the aircraft from June 22, 2002 (the date of the aircraft purchase), through the July 9, 2002, asset sale to MSF, and continuously thereafter through June 2003, when MSF amended its post-sale complaint in the Tampa lawsuit to claim that the aircraft should have been included in the asset sale. This further illustrates that MSF understood that the $4.78 million aircraft was never a part of the $44 million asset purchase. Gimlet-eyed business executives do not "forget" to take possession at closing (much less, for eleven months thereafter) of a corporate jet they expect to be included in an acquisition.
6. KT Trading did not provide the funding for the aircraft, nor was the aircraft used in furtherance of the income-producing activities of the company before the asset sale. All of the millions of dollars paid to Raytheon for the purchase of the aircraft were funded by the ultimate owners of KT Holdings (which sold no assets to MSF).
As these undisputed facts illustrate, it is difficult to determine who has overreached moreMSF, by enthusiastically pursuing a complete windfall because Mr. Brown economized on legal fees in the aircraft transaction and tried the do-it-yourself approach; or the KT entities and Brown, who reacted to MSF's predatory legal claim by suing the very lawyers who warned Brown not to do what he ultimately did, unaccompanied by any lawyer from *65 the law firm, at the separate closing of the aircraft purchase from Raytheon.
New York law, like the law of any civilized state or country, includes well-recognized equitable principles to assure that the courts are not used as instruments to validate overreaching and never-intended windfalls. The application of these rules to undisputed, admitted facts is a matter of law and is not dependent here upon any triable question of fact. In this case, the trial court correctly concluded that New York law would not countenance a result never bargained for by seller and purchaser, and that New York law would not ignore the undisputed fact that another party (KT Holdings) provided all of the purchase money for the aircraft. Whether the mechanism is reformation of the asset purchase agreement to include the aircraft as an excluded asset,[3] a corrective FAA conveyance to change legal title to comport with the name of the true buyer and beneficial owner (KT Holdings),[4] or "mutual mistake" as between KT Holdings and MSF,[5] the outcome clearly should have been the same.
The same conclusion is also reached by considering the scope of work to be performed by the law firm under the written engagement letter signed by the appellants. It is undisputed that the law firm was to advise Brown and KT Trading regarding the asset sale to MSF, and that the law firm was not retained or paid to accompany Brown to the aircraft closing, to review the FAA conveyance document, or to attempt to change title following the KT Trading-MSF asset sale. While it is true that Brown asked questions of one or more attorneys within the law firm regarding certain aspects of the aircraft purchase, Brown himself testified that he thought buying a jet was similar to buying a car, and that he could therefore handle the Raytheon aircraft closing without an attorney. It is also undisputed that Brown was advised in writing not to place title in KT Trading (though he admits he later did exactly that), and that he did not want to list the aircraft in a schedule to the asset purchase agreement or otherwise make that transaction known to MSF.
This brings us to the unusual result in the Tampa litigation. As noted, MSF sued the KT entities and Brown there in June 2003, eleven months after the asset purchase closing. MSF claimed that KT had fraudulently induced MSF to purchase the assets, that Brown and others "sabotaged" the business after closing, and that the sellers breached the agreements by *66 (among other things) failing to deliver the aircraft to MSF.
Interestingly, the parties stipulated that the aircraft issue could be tried separately from the other claims. In April 2004, the Tampa court held that the aircraft was in fact the property of MSF.[6] Although this result seems incomprehensible in light of the undisputed facts and the applicable New York law already described, several additional undisputed facts in the record provide some insight into why the Tampa court may have ruled as it did.
First, the law firm which defended the KT entities and Brown in Tampa is the same firm that represented them in the subsequent lawsuit in Miami against Akerman and two of its shareholders. Second, the Tampa judgment was quickly followed by a settlement among the KT entities, Brown, and MSF. As part of that settlement, other claims in the lawsuit were dropped, KT Trading repurchased assets previously sold to MSF, KT Trading kept its aircraft, and the parties to the settlement apportioned a value of $4.5 million of the amount paid by KT Trading to MSF as compensation for the "repurchase" of the jet aircraft.[7] This essentially optimized the damages claim of the KT entities and Brown for purposes of a lawsuit against Akerman Senterfitt, and that Miami lawsuit followed the Tampa settlement by a month. The Tampa settlement also assured that there would be no rehearing, and no direct appellate review, of the unusual Tampa judgment relating to the aircraft.
It matters not whether the judgment in Tampa was a collusive settlement document (part of a joint effort by KT/Brown and MSF to maximize the involuntary financial participation of a non-party, Akerman Senterfitt, or its insurers), resulted from KT/Brown's failure to specifically plead "mutual mistake" (as the trial court found), or resulted from a legal error by the Tampa court. Under any of those scenarios, the trial court in the Miami case was correct in its evaluation of the undisputed facts and well-settled New York law. The trial court in this case correctly concluded that:
[The KT entities and Brown], as defendants in the Tampa Lawsuit, had an irrefutable claim for reformation under New York law. There is no question that [KT Trading and Brown] never intended to convey to the Purchaser [MSF] the Airplane through the Asset Purchase Agreement, and thus, to the extent that the language of that agreement resulted in transfer of the Airplane, it failed to express [KT Trading's and Brown's] intent. Further, the Purchaser confirmed that it never intended to purchase the Airplane.

Conclusion
Most reformation, "mutual mistake," and "beneficial title" cases involve disputed facts and are inappropriate for summary disposition. In this case, however, the undisputed facts controlled the trial court's analysis and our review. MSF's claim to the aircraft was refuted as a matter of law by the simple facts that it did not know about, bargain for, or pay for the jet. *67 There is no justicenonein MSF's attempt to turn Brown's simple mistake into an early multi-million dollar holiday gift to itself.
As to the KT entities' and Brown's claim against the law firm and its lawyers, the undisputed facts simply underscore the hazards of self-representation in a multi-million dollar aviation transaction. Brown's attempt to turn his own mistake into a claim for millions of dollars of damages (against the law firm that correctly warned Brown not to title the aircraft in the name of KT Trading) was correctly rejected.
Affirmed.
RAMIREZ, C.J., concurs.
SHEPHERD, J., dissenting.
The only issue before the trial court was whether the failure of the KT entities to raise mutual mistake in the Tampa lawsuit was an intervening cause of the loss of the aircraft. As the law firm and attorney defendants describe in their answer brief:
In the trial court, Akerman and two of its shareholders who were also sued in this action, Carlos J. Deupi ("Deupi"), and Stewart H. Lapayowker ("Lapayowker") (collectively, the "Akerman Attorneys") moved for summary judgment on grounds that the MacKnight Companies caused their own damages by failing to present the winning defense of mutual mistake in the Tampa Lawsuit. Solely to avoid manufactured issues of fact, and to narrow the issues before the trial court to the single issue of the circumstances of the Tampa Lawsuit, the Akerman Attorneys conceded  for purpose of their Motion for Summary Judgment only  negligence in allowing the Asset Agreement to convey the Airplane. (Emphasis added).
The trial court granted summary judgment to the Akerman Attorneys[8] on that narrow ground:
Because Plaintiffs failed to raise the mutual mistake in the Tampa Lawsuit, Defendants are granted partial summary judgment on Counts I and II of the Complaint, and Plaintiffs shall not recover any damages resulting from the Final Judgment entered against them in the Tampa Lawsuit, including, without limitation, Plaintiff's damages from the loss of title to, and the right to legal possession of the Airplane. (Emphasis added).
The majority, however, exceeds its review authoritylimited to conducting a de novo review of the order appealedand grants appellate summary judgment to the Akerman Attorneys on an incomplete record. The majority justifies its decision with the comment "[t]here is no justice" in any other result. See Maj. Op. at 67. I would reply that there is no justice in granting appellate summary judgment against a party without notice and due process, which is what this Court is doing today, contrary to the tenets upon which this Court has operated since its formation.
This may be a thin liability case. The KT Holdings plaintiffs admit as much, alleging only the Akerman Attorneys are comparatively responsible for the loss of their airplane. While the Akerman Attorneys advised Mr. Brown not to title the airplane in the name of MacKnight Smoked Foods, evidence also exists in the record that the Akerman Attorneys considered *68 it their responsibility to be sure the aircraft did not need to be scheduled. For example, three weeks before the Smoked Foods closing, Carlos Deupi, the Akerman partner in charge of the transaction, called Stewart Lapayowker, an Akerman aviation specialist, to follow up on the jet. Mr. Lapayowker responded with an e-mail stating:
Sorry, I listened to your voicemail. I'll touch base with Jon [Brown] and confirm. I think he was going to take the path of least resistence (sic) and put the aircraft in the Holding Company even if it cost him a bit more in sales/use tax. He didn't seem to want to apply any infrastructure/personnel to administering the other suggested structures. Again, I'll confirm. SHL.
As Mr. Lapayowker admitted in his deposition, he never spoke with Mr. Brown and never followed up with Mr. Deupi. Likewise, Mr. Deupi never followed up with Mr. Lapayowker and never did anything further to be certain the jet did not need to be scheduled.[9] The majority fails to mention this testimony from the record. It also overlooks the KT entities were not required to negate any evidence that the Akerman Attorneys were not negligent.
The majority finds the final judgment in the Tampa lawsuit, awarding the aircraft to MSF, so "incomprehensible in light of the undisputed facts and the applicable New York law" that it finds it necessary to floatbut, tellingly, falls short of taking ownership ofa post-Tampa Aircraft Final Judgment conspiracy theory to, in its own words, "provide some insight into why the trial court may have ruled as it did." See Maj. Op. at 66. At the same time, the majority fails to relate a significant fact namely the trial judge made an express finding of fact that the [Smoked Foods Asset Purchase A]greement "is complex, but it is not ambiguous, and by the specific terms thereof, ownership and title to the aircraft is vested in Plaintiff [MSF]." (Emphasis added). Sanctity of contract, when unambiguous, is a first principle of our jurisprudence. See Perry Banking Co. v. Swilley, 154 Fla. 221, 17 So.2d 103, 104 (1944) ("Sanctity of contract is fundamental in the law of this country, so much so that it is protected by the Constitution."). It yields only under the most exacting of circumstances.
Reformation is one of those circumstances, and for the reason just stated, the proof required is accordingly not only exacting but rigorously scrutinized. Under New York law, just as under Florida law, reformation is permitted where there is a mutual mistake, e.g., "where the parties have a real and existing agreement on particular terms and subsequently find themselves signatories to a writing which does not reflect that agreement." Harris v. Uhlendorf, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892, 894 (1969); see also Circle Mortgage Corp. v. Kline, 645 So.2d 75, 78 (Fla. 4th DCA 1994) ("A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument."). The rationale for reformation is that a court sitting in equity does not alter the parties' agreement, but allows the defective instrument to be corrected to reflect the true terms of the agreement the parties actually reached. N.E. Shares Corp. v. Int'l Ins. Co. of N.Y., 240 A.D. 80, 269 N.Y.S. 351, 354 (N.Y.App.Div. 1934); see also Circle *69 Mortgage Corp., 645 So.2d at 78. In addition, to further assure the sanctity of contracts, the reformation proponent must prove the existence of the prior agreement by clear and convincing evidence. Migliore v. Manzo, 28 A.D.3d 620, 813 N.Y.S.2d 762, 764 (N.Y.App.Div.2006) ("A party seeking to invoke equity to reform a written agreement based upon a purported mistake bears the burden of showing a mutual mistake by clear and convincing evidence."); see also BrandsMart U.S.A. of W. Palm Beach, Inc. v. DR Lakes, Inc., 901 So.2d 1004, 1006 (Fla. 4th DCA 2005) ("Due to the strong presumption that a written agreement accurately expresses the parties intent, the party seeking reformation based on a mutual mistake must prove its case by clear and convincing evidence.").
In this case, the instrument was not defective. MacKnight Smoked Foods intended to sell all of its assets except those on the "Excluded List." MSF contracted to buy all of the assets of Smoked Foods, unless the asset was listed on the "Excluded List." Only Jon Brown knew about the aircraft. It was his mistake, allegedly worsened through a lack of diligence by the Akerman Attorneys, in failing to list the aircraft on the "Excluded List." Under New York law, "[t]o reform a written instrument based upon mutual mistake, the proponent of reformation must show, by clear and convincing evidence, not merely that a mistake exists, but exactly what the parties agreed upon." Miller v. Seibt, 13 A.D.3d 496, 788 N.Y.S.2d 126, 127 (N.Y.App.Div.2004). There is no definition of "mutual" that can be stretched to encompass these facts.
A careful reading of the majority opinion reveals the majority improperly reached the merits of the KT entities' case. The majority concludes, "MSF's claim to the aircraft was refuted as a matter of law by the simple fact that it did not know about, bargain for or pay for the jet." See Maj. Op. at 66. That conclusion, of course, does not equate to the doctrine of mutual mistake under New York law. See supra pp. 63-64. It is simply the majority's evaluation of the evidence, which is contradicted by the core provision of the purchase agreement that the trial court in the Tampa case found unambiguous:
"[A]t the Closing, the Buyer [MSF] shall purchase from MacKnight [Smoked] Foods and MacKnight [Smoked] Foods shall sell, transfer, assign and deliver to Buyer, all of the right title and interest in and to all of the tangible and intangible assets, business, goodwill and rights of MacKnight [Smoked] Foods, other than the Excluded Assets ... as the same shall exist immediately prior to Closing." (Emphasis added).
It is also contradicted by the testimony of MSF's representative and chief negotiator, Felix Wong, that while he admittedly was "not aware of the airplane pre-closing, when I valued the business and made the offer, it was for all of the assets, regardless of what they were or whether we knew about them."[10] Even if the appellate *70 summary judgment was permissible under our Rules, it would be error to grant summary judgment to the Akerman Attorneys on the record in this case.
It may have been, upon a trial of this case, a jury would have exonerated the Akerman Attorneys. It also may be (put me in the doubtful category), that the Akerman Attorneys have a meritorious basis for summary judgment on a ground other than the one on which they erroneously prevailed below. If so, however, it is our duty to require the Akerman Attorneys to accomplish itas we require of all litigantsthe old-fashioned way; they should earn it.
I would reverse this case for further proceedings.
NOTES
[1] As in many corporate asset transactions, the names of the entities changed over the course of the transaction. Smoked Foods' corporate name was changed to KT Trading USA, Inc. after the asset sale, and Holdings' corporate name was changed to KT Holdings USA, Inc., at that time. The name of the asset purchaser, MSF, was changed to MacKnight Smoked Foods after the closing.
[2] The closing of the purchase of the jet occurred before the closing of the asset purchase transaction. If title to the jet was to be taken in the name of Smoked Foods, the aircraft would have to be scheduled as an "excluded asset," and MSF would be alerted to the purchase before the asset purchase transaction closed. Accordingly, an Akerman shareholder recommended to Brown that he arrange for the aircraft to be conveyed to Holdings or a new single-purpose entity. Brown admitted that, despite that advice, he participated in the aircraft purchase closing without counsel, and he directed or allowed Raytheon to convey the jet to Smoked Foods.
[3] As cited by the trial court, Harris v. Uhlendorf, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892, 894 (1969), and Miller v. Seibt, 13 A.D.3d 496, 788 N.Y.S.2d 126 (N.Y.App.Div. 2004), explain this principle and apply it to analogous facts.
[4] Because KT Trading remained in existence following the asset sale, it could have conveyed the aircraft to KT Holdings in an instrument reciting the pertinent facts that KT Holdings paid for the aircraft and that the original conveyance was simply an error by Mr. Brown in the separate closing with Raytheon.
[5] KT Holdings was also a party to the asset purchase agreement with MSF, KT Trading, and other entities. The trial court correctly relied upon U.S. Bankruptcy Judge A. Jay Cristol's application of New York law to similar facts: "Where a contract fails to reflect the true agreement reached by the parties, based on their mutual mistake in failing to enter into a writing reflecting their true agreement, it is appropriate that the contract be reformed to properly reflect the agreement reached by the parties." PMI Inv., Inc. v. Rose (In re Prime Motor Inns, Inc.), 167 B.R. 261, 286-87 (Bankr.S.D.Fla. 1994). Here, as in PMI Investment, the parties' intentions have been established by "clear, convincing, and overwhelming evidence." Id. In this case, that evidence happens to be undisputed.
[6] The record below does not disclose whether the Tampa court was presented an agreed form of final judgment or whether the Tampa court prepared the final judgment itself. The record does disclose that there were active settlement negotiations between KT/Brown and MSF in the days before the non-jury trial was to end.
[7] KT then sold the aircraft to an unrelated buyer for $3.75 million, a value used in a pretrial settlement communication between KT/Brown and MSF.
[8] For the reader's convenience, I will include the law firm in this appellation throughout this dissent.
[9] As Akerman aviation specialist Lapayowker must have known, an electronically assisted aircraft title search of the records of the Federal Aviation Administration (FAA) in Oklahoma City, Oklahoma, prior to the closing also would have readily revealed how the aircraft was titled.
[10] Any intimation by the majority that MSF valued MacKnight Smoked Foods based upon any "appraised values" of assets is incorrect. See Maj. Op. at 64. In response to the question, "Tell me how you came up with the price for MacKnight," Wong replied:

What we did was we looked at the historical performance of the company on an adjusted basis. We did as much industry research that we could on the consumption of salmon, consumption of smoked salmon, examined all kinds of information, anything that we could get our hands on to give us a clue as to, you know, how quickly the company might grow during our ownership period if we were successful in buying it.
Wong further testified unequivocally that MSF did not perform an investigation of all of the assets of Smoked Foods. He was asked:
Q. But at the time that you did your valuation, did you perform some investigation of the assets of significant value?
A. No.
Q. Why Not?
A. We don't value businesses based upon assets.
Q. Okay. As part of the due diligence was anything done to confirm value, condition or title to the significant assets?
A. A lien search would have been conducted, but that would have been done primarily by the attorneys to make sure we have good title to the various assets. No attempt was made to identify every asset that was being acquired. The assumption was that everything was being conveyed...."