SALTER, J.
KT Holdings USA, Inc., and KT Trading USA, Inc., appeal a final summary judgment in favor of Akerman, Senterfitt & Eidson, P.A., and two of its attorneys in a circuit court action alleging legal malpractice. The issue is whether the law firm and lawyers negligently allowed KT Trading’s recently-purchased $4.8 million private jet aircraft to become part of an asset purchase transaction. Because the salient facts were not in dispute and the controlling legal principles support summary disposition, we affirm the final summary judgment.

The Asset Purchase Transaction and the Separate Aircraft Purchase

MacKnight Smoked Foods, Inc. (Smoked Foods), operated a profitable food business. Jonathan Brown was president of Smoked Foods and president of MacKnight Holdings, Inc. (Holdings). Holdings owned all of the stock of Smoked Foods. In early 2002, Smoked Foods and Holdings entered into a letter of intent whereby Smoked Foods would sell all of its assets to MSF Acquisition Corp. (MSF).[1] Smoked Foods and Holdings re *63 tained the Akerman law firm to provide legal representation to them in the transaction.
Shortly after entering into the letter of intent to sell the assets of Smoked Foods to MSF for $44,000,000, but before the closing of that transaction, Brown and other owners of Holdings decided to buy a new “Premier One” corporate jet from Raytheon. Brown did not retain Akerman or its attorneys to guide him in the negotiation of the purchase contract with Ray-theon, to represent him at the closing of the $4,780,000 purchase of the jet, or to review the written conveyance document executed by Raytheon for filing with the Federal Aviation Administration. Brown did tell attorneys at Akerman that he and the other shareholders of Holdings did not want to disclose the purchase of the jet to MSF, and one or more of the Akerman attorneys told Brown that he should not place title to the aircraft in Smoked Foods.[2]
When the asset purchase transaction closed — only about two weeks after Brown closed the purchase of the aircraft in the name of Smoked Foods — the jet was not listed on the schedule of excluded assets. The jet was purchased with funds obtained from Holdings and the shareholders of that entity, and it was never used in connection with the business of Smoked Foods. Smoked Foods never intended to sell the jet to MSF, MSF never intended to buy it, and the asset purchase price was computed on the basis of financial statements and appraisals that did not include the aircraft.
Brown and his newly-hired pilot did not deliver the aircraft to MSF following the closing, and for almost a year after closing MSF made no inquiry, much less a demand, regarding the jet. When other post-closing disputes arose between Smoked Foods and MSF in 2003, however (about eleven months following the asset purchase closing), MSF sued Smoked Foods, Holdings, Brown, and other parties in the circuit court in Tampa. MSF then learned that the jet was titled in Smoked Foods on the date of the 2002 asset purchase closing and included a claim for “recovery” of the aircraft in that Tampa lawsuit.

The Malpractice Lawsuit

In 2004, Smoked Foods and Holdings (then known by their post-closing names, KT Trading USA and KT Holdings) sued Akerman and two of its shareholders for legal malpractice in the circuit court in Miami, claiming that the defendants’ legal malpractice caused KT Trading to pay millions of dollars of damages and incur legal expenses (in the Tampa litigation brought by MSF) in order to keep the aircraft. After extensive discovery, the law firm defendants moved for and obtained a final summary judgment in the Miami lawsuit. The trial court reasoned that the true cause of any losses by the KT entities regarding the aircraft was their failure to assert “mutual mistake” as an affirmative *64 defense in the Tampa lawsuit. This appeal followed.

Analysis

The issue here, just as it was below, is whether the movants for summary judgment successfully established that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law. Fla. R. Civ. P. 1.510(c); Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). Our consideration of the asset purchase transaction is governed by the parties’ contractual choice of law (New York), while our analysis of the legal malpractice claim is based on Florida law.
The undisputed facts that control this analysis are:
1. The KT entities did not intend to include the new jet aircraft as part of the corporate assets being sold to MSF.
2. MSF did not intend to purchase that new jet aircraft. Indeed, MSF was completely unaware that KT Trading had acquired the aircraft until a dispute over other issues began months after the sale of assets by KT Trading to MSF. The negotiated price for the assets sold to MSF was established before KT Trading acquired the aircraft, and on the basis of appraised values and prior-period financial results that were wholly unrelated to the aircraft.
3. The president of KT Trading and KT Holdings, Mr. Brown, admitted that he made two key decisions regarding the aircraft: (1) he did not retain the Akerman law firm or its lawyers to participate with him in the closing of the purchase of the aircraft; and, (2) he placed title to the aircraft in KT Trading despite specific advice to title the aircraft in KT Holdings or in a new single-asset company.
4. Brown intended that MSF be unaware of the purchase of the multi-million dollar aircraft. An experienced business person, he understood that the purchaser of KT Trading’s assets might sense additional leverage if it knew that the seller needed several million dollars for the aircraft closing right around the time of the asset sale. Adding the aircraft to KT Trading’s “excluded asset” schedule in preparation for closing would have telegraphed the aircraft purchase to MSF.
5. KT Trading had record title to, and its parent company operated, the aircraft from June 22, 2002 (the date of the aircraft purchase), through the July 9, 2002, asset sale to MSF, and continuously thereafter through June 2003, when MSF amended its post-sale complaint in the Tampa lawsuit to claim that the aircraft should have been included in the asset sale. This further illustrates that MSF understood that the $4.78 million aircraft was never a part of the $44 million asset purchase. Gimlet-eyed business executives do not “forget” to take possession at closing (much less, for eleven months thereafter) of a corporate jet they expect to be included in an acquisition.
6. KT Trading did not provide the funding for the aircraft, nor was the aircraft used in furtherance of the income-producing activities of the company before the asset sale. All of the millions of dollars paid to Raytheon for the purchase of the aircraft were funded by the ultimate owners of KT Holdings (which sold no assets to MSF).
As these undisputed facts illustrate, it is difficult to determine who has overreached more — MSF, by enthusiastically pursuing a complete windfall because Mr. Brown economized on legal fees in the aircraft transaction and tried the do-it-yourself approach; or the KT entities and Brown, who reacted to MSF’s predatory legal claim by suing the very lawyers who warned Brown not to do what he ultimately did, unaccompanied by any lawyer from *65 the law firm, at the separate closing of the aircraft purchase from Raytheon.
New York law, like the law of any civilized state or country, includes well-recognized equitable principles to assure that the courts are not used as instruments to validate overreaching and never-intended windfalls. The application of these rules to undisputed, admitted facts is a matter of law and is not dependent here upon any triable question of fact. In this case, the trial court correctly concluded that New York law would not countenance a result never bargained for by seller and purchaser, and that New York law would not ignore the undisputed fact that another party (KT Holdings) provided all of the purchase money for the aircraft. Whether the mechanism is reformation of the asset purchase agreement to include the aircraft as an excluded asset,[3] a corrective FAA conveyance to change legal title to comport with the name of the true buyer and beneficial owner (KT Holdings),[4] or “mutual mistake” as between KT Holdings and MSF,[5] the outcome clearly should have been the same.
The same conclusion is also reached by considering the scope of work to be performed by the law firm under the written engagement letter signed by the appellants. It is undisputed that the law firm was to advise Brown and KT Trading regarding the asset sale to MSF, and that the law firm was not retained or paid to accompany Brown to the aircraft closing, to review the FAA conveyance document, or to attempt to change title following the KT Trading-MSF asset sale. While it is true that Brown asked questions of one or more attorneys within the law firm regarding certain aspects of the aircraft purchase, Brown himself testified that he thought buying a jet was similar to buying a car, and that he could therefore handle the Raytheon aircraft closing without an attorney. It is also undisputed that Brown was advised in -writing not to place title in KT Trading (though he admits he later did exactly that), and that he did not want to list the aircraft in a schedule to the asset purchase agreement or otherwise make that transaction known to MSF.
This brings us to the unusual result in the Tampa litigation. As noted, MSF sued the KT entities and Brown there in June 2003, eleven months after the asset purchase closing. MSF claimed that KT had fraudulently induced MSF to purchase the assets, that Brown and others “sabotaged” the business after closing, and that the sellers breached the agreements by *66 (among other things) failing to deliver the aircraft to MSF.
Interestingly, the parties stipulated that the aircraft issue could be tried separately from the other claims. In April 2004, the Tampa court held that the aircraft was in fact the property of MSF.[6] Although this result seems incomprehensible in light of the undisputed facts and the applicable New York law already described, several additional undisputed facts in the record provide some insight into why the Tampa court may have ruled as it did.
First, the law firm which defended the KT entities and Brown in Tampa is the same firm that represented them in the subsequent lawsuit in Miami against Aker-man and two of its shareholders. Second, the Tampa judgment was quickly followed by a settlement among the KT entities, Brown, and MSF. As part of that settlement, other claims in the lawsuit were dropped, KT Trading repurchased assets previously sold to MSF, KT Trading kept its aircraft, and the parties to the settlement apportioned a value of $4.5 million of the amount paid by KT Trading to MSF as compensation for the “repurchase” of the jet aircraft.[7] This essentially optimized the damages claim of the KT entities and Brown for purposes of a lawsuit against Akerman Senterfitt, and that Miami lawsuit followed the Tampa settlement by a month. The Tampa settlement also assured that there would be no rehearing, and no direct appellate review, of the unusual Tampa judgment relating to the aircraft.
It matters not whether the judgment in Tampa was a collusive settlement document (part of a joint effort by KT/ Brown and MSF to maximize the involuntary financial participation of a non-party, Akerman Senterfitt, or its insurers), resulted from KT/Brown’s failure to specifically plead “mutual mistake” (as the trial court found), or resulted from a legal error by the Tampa court. Under any of those scenarios, the trial court in the Miami case was correct in its evaluation of the undisputed facts and well-settled New York law. The trial court in this case correctly concluded that:
[The KT entities and Brown], as defendants in the Tampa Lawsuit, had an irrefutable claim for reformation under New York law. There is no question that [KT Trading and Brown] never intended to convey to the Purchaser [MSF] the Airplane through the Asset Purchase Agreement, and thus, to the extent that the language of that agreement resulted in transfer of the Airplane, it failed to express [KT Trading’s and Brown’s] intent. Further, the Purchaser confirmed that it never intended to purchase the Airplane.

Conclusion

Most reformation, “mutual mistake,” and “beneficial title” cases involve disputed facts and are inappropriate for summary disposition. In this case, however, the undisputed facts controlled the trial court’s analysis and our review. MSF’s claim to the aircraft was refuted as a matter of law by the simple facts that it did not know about, bargain for, or pay for the jet. *67 There is no justice — none—in MSF’s attempt to turn Brown’s simple mistake into an early multi-million dollar holiday gift to itself.
As to the KT entities’ and Brown’s claim against the law firm and its lawyers, the undisputed facts simply underscore the hazards of self-representation in a multimillion dollar aviation transaction. Brown’s attempt to turn his own mistake into a claim for millions of dollars of damages (against the law firm that correctly warned Brown not to title the aircraft in the name of KT Trading) was correctly rejected.
Affirmed.
RAMIREZ, C.J., concurs.

. As in many corporate asset transactions, the names of the entities changed over the course of the transaction. Smoked Foods' corporate name was changed to KT Trading USA, Inc. *63 after the asset sale, and Holdings' corporate name was changed to KT Holdings USA, Inc., at that time. The name of the asset purchaser, MSF, was changed to MacKnight Smoked Foods after the closing.

. The closing of the purchase of the jet occurred before the closing of the asset purchase transaction. If title to the jet was to be taken in the name of Smoked Foods, the aircraft would have to be scheduled as an "excluded asset,” and MSF would be alerted to the purchase before the asset purchase transaction closed. Accordingly, an Akerman shareholder recommended to Brown that he arrange for the aircraft to be conveyed to Holdings or a new single-purpose entity. Brown admitted that, despite that advice, he participated in the aircraft purchase closing without counsel, and he directed or allowed Raytheon to convey the jet to Smoked Foods.

. As cited by the trial court, Harris v. Uhlendorf, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892, 894 (1969), and Miller v. Seibt, 13 A.D.3d 496, 788 N.Y.S.2d 126 (N.Y.App.Div.2004), explain this principle and apply it to analogous facts.

. Because KT Trading remained in existence following the asset sale, it could have conveyed the aircraft to KT Holdings in an instrument reciting the pertinent facts that KT Holdings paid for the aircraft and that the original conveyance was simply an error by Mr. Brown in the separate closing with Ray-theon.

. KT Holdings was also a party to the asset purchase agreement with MSF, KT Trading, and other entities. The trial court correctly relied upon U.S. Bankruptcy Judge A. Jay Cristol's application of New York law to similar facts: "Where a contract fails to reflect the true agreement reached by the parties, based on their mutual mistake in failing to enter into a writing reflecting their true agreement, it is appropriate that the contract be reformed to properly reflect the agreement reached by the parties.” PMI Inv., Inc. v. Rose (In re Prime Motor Inns, Inc.), 167 B.R. 261, 286-87 (Bankr.S.D.Fla.1994). Here, as in PMI Investment, the parties' intentions have been established by "clear, convincing, and overwhelming evidence.” Id. In this case, that evidence happens to be undisputed.

. The record below does not disclose whether the Tampa court was presented an agreed form of final judgment or whether the Tampa court prepared the final judgment itself. The record does disclose that there were active settlement negotiations between KT/Brown and MSF in the days before the non-jury trial was to end.

. KT then sold the aircraft to an unrelated buyer for $3.75 million, a value used in a pretrial settlement communication between KT/Brown and MSF.